295 N.J. Super. 212 (1996)
684 A.2d 994
NANCY WEISS, EXECUTRIX OF THE ESTATE OF RUSSELL M. WOOD, AND NANCY WEISS, EXECUTRIX OF THE ESTATE OF CHRISTINE WOOD, AND ROBERT E. WOOD, INDIVIDUALLY AND NANCY WEISS, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
IRWIN GOLDFARB, M.D.; W.R. CHENITZ, M.D.; BASSAM HADDAD, M.D.; ST. MICHAEL'S MEDICAL CENTER; DONALD RUBENSTEIN, M.D.; ADOLF SENFT, M.D.; CECIL MATTHEWS, M.D.; MICHAEL GUMA, M.D.; ANGELINA FORSHAGE, R.N.; AND LILY MATULAC, R.N., DEFENDANTS-RESPONDENTS, AND AMER AL-ZARKA, M.D.; EDWARD MANZELLA, M.D.; A. JOSEPHINE VILLANUEVA, R.N.; A. JOSE DAIRO, L.P.N.; AND R. BARCELONA, R.N., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1996.
Decided November 20, 1996.
*215 Before Judges PRESSLER, STERN and WECKER.
*216 Arthur L. Raynes argued the cause for appellants (Wiley, Malehorn and Sirota, attorneys; Mr. Raynes, of counsel and on the brief with James M. McCreedy).
Patrick J. Hughes argued the cause for respondents St. Michael's Medical Center, Cecil Matthews, M.D., Michael Guma, M.D., Angelina Forshage, R.N. and Lily Matulac, R.N. (Connell, Foley & Geiser, attorneys; Mr. Hughes, of counsel and on the brief with Mollie K. O'Brien).
Benjamin H. Haftel argued the cause for respondent Bassam Haddad, M.D. (Hurley & Vasios, attorneys; Mr. Haftel, on the brief).
James B. Sharp argued the cause for respondent Donald Rubenstein, M.D. (Reiseman & Sharp, attorneys; Mr. Sharp, of counsel; Cheryl H. Kriney, on the brief).
James R. Korn argued the cause for respondent Irwin Goldfarb, M.D. (McDonough, Korn, Eichhorn & Boyle, attorneys; Mr. Korn, of counsel; William S. Mezzomo, on the brief).
Louis A. Ruprecht argued the cause for respondent Adolf Senft, M.D. (Ruprecht & Hart, attorneys; Mr. Ruprecht, of counsel and on the brief).
Philip F. Mattia argued the cause for respondent William R. Chenitz, M.D. (De Yoe, Heissenbuttel & Mattia, attorneys; Mr. Mattia, of counsel and on the brief with L. John Topchik).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a medical malpractice case. Plaintiff's decedent, Robert A. Wood, died following a cardiac arrest while undergoing dialysis at St. Michael's Medical Center. He had come to the dialysis unit from the hospital's telemetry unit where, because of a variety of arrythmia problems, his heart had been continuously monitored since his arrival at the hospital two days earlier. He was not connected to a monitor in the dialysis unit. The gravamen of the *217 plaintiff's case is that the hospital and the physicians and nurses responsible for decedent's care were negligent in permitting the dialysis to take place without decedent's heart being monitored and that had it been monitored, the cardiac arrest would have been observed and counteracted and his life would have been spared. The jury found the hospital alone to have been negligent, returning a verdict against it of $150,000, of which only $10,000 was collectible by reason of the limitation of N.J.S.A. 2A:53A-8.[1] Plaintiff appeals from both judge and jury findings of non-liability in respect of the other defendants and from the judge's refusal, based on the authority of Johnson v. Mountainside Hospital, 239 N.J. Super. 312, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990), to apprise the jury of the statutory damages limitation in favor of the hospital. We affirm in part and reverse in part.
Decedent, then 67 years old and suffering from long-term hypertension and various coronary and renal problems, was admitted to St. Joseph's Hospital in June 1989 complaining of chest pain. He was there diagnosed as suffering from non-sustained ventricular tachycardia and atrial fibrillation, as well as from chronic kidney failure. An angiogram revealed some blockage of a coronary artery. He was placed on a heart monitor and also began to receive dialysis treatments on a three-day-a-week schedule, remaining on the monitor during the treatments. His cardiologist, Dr. Cohen, concerned that the arrhythmia problems might be life-threatening in that they posed a risk of fatal ventricular fibrillation, wanted defendant to submit to electro-physiological diagnosis as the basis for a treatment plan. Since St. Joseph's did not have an electro-physiology service, Dr. Cohen referred decedent to the telemetry unit at St. Michael's and to the care there of Dr. Irwin Goldfarb as attending cardiologist and Dr. Donald *218 Rubenstein, a specialist in arrhythmia problems and director of St. Michael's electro-physiology unit.
Decedent arrived at St. Michael's on Thursday, July 13, 1989, two weeks after his admission to St. Joseph's. He was immediately placed in the telemetry unit under the care of Drs. Goldfarb and Rubenstein. Being placed in the telemetry unit meant that the patient was connected automatically to a cardiac monitor under continuous observation. Dr. Rubenstein performed a series of electro-physiological tests on Friday, July 14. He concluded that the major arrythmia problem, the ventricular tachycardia, was "benign" in that it could not be electrically induced. In an attempt to control the arrythmia with medication, he prescribed two drugs, Tenormin and Quiniglute. Late Friday afternoon, Dr. Goldfarb, with whom Dr. Rubenstein had been conferring, left for the weekend and turned decedent's general cardiac management over to Dr. Adolph Senft, the cardiologist who was covering for him. In the meantime, decedent had missed his Friday dialysis treatment, and after inquiry from his family, Dr. Goldfarb, on that Friday evening, telephoned Dr. W.R. Chenitz, chairman of St. Michael's nephrology department, to arrange to have decedent dialyzed the next day, Saturday. As Dr. Chenitz was also planning to be away that weekend, he turned decedent's nephrology care over to another nephrologist, Dr. Bassam Haddad.
Dr. Haddad visited decedent in the telemetry unit at 7:30 a.m. on Saturday. He reviewed the chart, noted the electro-physiologically confirmed diagnosis of non-sustained ventricular tachycardia as well as decedent's various other diagnoses, gave decedent a physical examination, and was satisfied that his condition was stable. It was his judgment that the dialysis could and should proceed, and he wrote the order for a three-and-a-half hour dialysis treatment to take place that afternoon. Half an hour later, at 8 a.m., Dr. Senft was telephoned by a telemetry-unit nurse who advised him that decedent had developed a junctional rhythm, an abnormality indicating potentially serious risk to the patient. Dr. Senft immediately went to the unit, verified that that *219 was so, and called Dr. Rubenstein. Dr. Rubenstein had decedent get out of bed and walk around. After about half an hour, his heart returned to a normal sinus rhythm, leading Dr. Rubenstein to believe that the episode of junctional rhythm had been caused by decedent's protracted lying in bed or the Tenormin or a combination of the two. He therefore wrote an order discontinuing the Tenormin and continuing the Quiniglute.
Decedent was taken to the dialysis unit at about noon. It is undisputed that he arrived there unconnected to a cardiac monitor although no order had been written in decedent's chart discontinuing the monitoring. It is also undisputed that Dr. Haddad's dialysis order did not mention monitoring although the dialysis unit had a monitor. It was never clearly established by whom or by whose order decedent was disconnected before leaving the telemetry unit. Apparently, although the decedent's full chart accompanied him to the dialysis unit, the practice in the dialysis unit was for the dialysis nurse to concern herself only with the nephrologist's dialysis order. Angelina Forshage, the original attending nurse, was not even aware that decedent had come to dialysis from the telemetry unit. In any event, in preparing decedent for dialysis, she noted that he had an irregular heartbeat. She did not, however, report this finding to a physician although she did discuss with Dr. Haddad, by telephone, details regarding the dialysis solution he had prescribed.
The dialysis treatment began at about 12:30 p.m. Forshage checked decedent's vital signs half an hour later, again twenty minutes later, and then forty-five minutes after that. At 2 p.m., after making her last check, she left for lunch and turned decedent over to another nurse, Lily Matulac. Matulac first checked decedent's vital signs at 2:25 p.m. She found him unresponsive with no blood pressure. An alert code was called, and decedent was eventually resuscitated. He had, however, sustained irreversible brain damage as a result of loss of oxygen and remained in a coma. He died a month later without regaining consciousness. Plaintiff's experts all opined that had his heart been monitored *220 during the dialysis, the arrest could have been avoided altogether or counteracted in time to avoid consequential brain damage.
Plaintiff Nancy Weiss, executrix of decedent's estate and of the estate of his widow, Christine Wood, who died a year after he did, commenced this malpractice action against St. Michael's; the two nurses; two residents, Drs. Matthews and Guma, who had attended decedent in the telemetry unit; and all the attending doctors, Drs. Rubenstein, Goldfarb, Senft, Haddad and Chenitz. Prior to trial, partial summary judgments were granted dismissing Dr. Chenitz and the two residents. Following the close of plaintiff's proofs at trial, her claims against Dr. Goldfarb and the two dialysis nurses were dismissed pursuant to R. 4:37-2(b). The case went to the jury against Drs. Rubenstein, Senft and Haddad and the hospital. The jury returned a verdict finding no cause for action against the doctors but finding that the hospital was negligent. It awarded total damages of $150,000 of which, as we have noted, only $10,000 is collectible. Plaintiff's motion for a new trial was denied, and she appeals from the partial summary judgments, the jury verdict, and the denial of her new trial motion. She raises these primary contentions: (1) the court erred in refusing to permit her to use the deposition of Dr. Chenitz during trial or to call him as a rebuttal witness, (2) there were sufficient disputed facts respecting liability to have precluded the grant of the partial summary judgment motions and the motions under R. 4:37-2(b), (3) the jury verdict was against the weight of the evidence, and (4) plaintiff was entitled to an ultimate outcome charge in respect of the statutory limit on the hospital's liability.
As to the partial summary judgments, we carefully reviewed the record, and we are satisfied that plaintiff's proofs against Dr. Chenitz and the two residents failed to make a prima facie case against any of them. See Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). We affirm those judgments substantially for the reasons stated by the respective motion judges.
*221 Before considering the remaining issues plaintiff raises in respect of the remaining defendants, we refer more specifically to the proofs. Plaintiff's experts included a cardiologist, a cardiologist with an electro-physiological sub-specialty, and a nephrologist. Each of the defendant physicians produced an expert in his own field of practice.[2] With respect to the three cardiology defendants, plaintiff's experts opined that particularly in view of the development of the junctional rhythm on Saturday morning, one or the other of them should have put off the dialysis, one or the other of them should have discussed decedent's case with the nephrologist before dialysis instead of leaving the nephrologist to the notes in the chart, and Dr. Rubenstein should immediately have discontinued the Quiniglute as well as the Tenormin. Drs. Rubenstein and Senft testified in great detail respecting their management of decedent's care in the telemetry unit and the reasons for their challenged decisions, and their experts fully supported the professional competence of their judgments and actions. Our careful review of the record convinces us that the jury's verdict of no cause in respect of these two cardiologists, contrary to plaintiff's assertion, comported with the weight of the evidence. We are also satisfied that the R. 4:37-2(b) dismissal of the claim against Dr. Goldfarb was entirely proper. He had turned over decedent's care to Dr. Senft before the appearance of the junctional rhythm, he had made the required contact with the nephrology department, and he had made clear, detailed, and appropriate notes in decedent's chart. There was no case against *222 him. We note, moreover, that since the jury found no liability on the part of Dr. Rubenstein and Dr. Senft, both of whom were considerably more involved with decedent's care as matters turned out, we are persuaded that even if the case against Dr. Goldfarb had continued, the likelihood of a verdict against him was a most remote possibility.
That leaves plaintiff's claims against the nephrologist, Dr. Haddad, and the two nurses in the dialysis unit. We conclude that it was error for the trial judge to have dismissed as against Nurse Forshage but not as against Nurse Matulac. We are also satisfied that plaintiff's case against Dr. Haddad was substantially prejudiced by the trial court's error in not permitting plaintiff to call Dr. Chenitz as a rebuttal witness or to use his deposition on cross-examination. There must consequently be a new trial as to these two defendants.
Our analysis of the case against Dr. Haddad and Nurse Forshage and our conclusion of error affecting their exculpation from liability, one by the judge and the other by the jury, is premised on the unanimous assertion by all the cardiologists who testified, both parties-defendant and experts for both sides, that decedent should not have been disconnected from the cardiac monitor when he went from the telemetry unit to the dialysis unit or, at least, that if he needed to be disconnected for purposes of transport from one unit to the other, he should have been reconnected when he got to the dialysis unit. The leitmotif of that expert testimony is not only that decedent needed the monitoring because of the complex and threatening nature of his cardiac problems, but, even more significantly, that once monitoring has been ordered by a physician, medical and hospital protocol requires a specific order to discontinue monitoring before a patient can be disconnected. There is no question that there was no order in decedent's chart for the discontinuation of monitoring. Drs. Rubenstein and Senft testified, moreover, that without such an order, which neither gave nor would have given at that juncture, it was their assumption that monitoring would be maintained in the dialysis unit. The question *223 then is how it came to pass that decedent was being dialyzed without monitoring.
While the inference is unavoidable that decedent was disconnected from the monitor before leaving the telemetry unit, there is nothing in the record to suggest who in fact did the disconnecting or under whose authority it was done. This brings us to Dr. Haddad's testimony. Dr. Haddad, to be sure, examined decedent and read his chart, including the arrythmia studies, on the fateful Saturday morning before the onset of the junctional rhythm. He ordered the dialysis for that afternoon, therefore, without knowledge of that subsequent event, and there is nothing in the record to indicate that he reviewed the chart again or had any other contact with decedent or his cardiologists between the 7:30 a.m. examination and the 12:30 p.m. start of dialysis. In any event, it was his testimony that when he evaluated decedent that morning, he was satisfied that his condition was entirely stable, his vital signs were good, and he was on appropriate rhythm-controlling medication. And although he was aware that decedent, as a telemetry unit patient, was on a cardiac monitor and had also been monitored while being dialyzed at St. Joseph's Hospital, he noted that decedent had tolerated that treatment well and with no problems. He made the judgment, therefore, that decedent did not need to be monitored while on dialysis that afternoon and his dialysis order was silent on that subject.
Thus, on cross-examination, Dr. Haddad was specifically asked if he had made "a decision on July fifteenth that Mr. Wood did not need to be monitored," and his answer was an unequivocal affirmative. He also denied that there was then in place a hospital policy requiring the nephrologist to consult, on a case-to-case basis, with the cardiologist caring for the patient to determine whether cardiac monitoring during dialysis was indicated. Dr. Haddad's expert witness, also a nephrologist, opined that Haddad's non-monitoring judgment was entirely unexceptionable based on decedent's physical condition when Haddad evaluated him, testifying further that patients with non-sustained ventricular *224 tachycardia are routinely dialyzed without monitors. We further note that although Dr. Haddad and his expert so opined, they also concurred, somewhat inconsistently, that a disconnect order would in any event have been necessary in order to discontinue monitoring under any circumstances. Indeed, plaintiff's expert in nephrology, the director of the dialysis unit at Montefiore Hospital in New York, testified that as a matter of routine, any patient leaving the telemetry unit for any interim purpose, including dialysis, should be continued on a cardiac monitor at all times.
We cannot, of course, know why the jury exculpated Dr. Haddad.[3] It is, however, as likely as not that it accepted as professionally sound Dr. Haddad's judgment that decedent did not require a monitor while he was being dialyzed and that Dr. Haddad, even though a nephrologist and not a cardiologist, was professionally competent to make that independent judgment. If this were all, we would be constrained to conclude that the evidence would support that view of the matter. The problem, however, is this. Plaintiff intended to call Dr. Chenitz, the chairman of the nephrology department at St. Michael's, as a rebuttal witness to counter the testimony of Dr. Haddad and his expert witness in this regard. There was no question as to the nature of the proffer. As plaintiff made clear to the trial court, she was seeking testimony from Dr. Chenitz consistent with his pretrial deposition, at which he testified that the hospital policy respecting the cardiac monitoring of dialysis patients was for the decision to be made on a case-to-case basis. As to who was to make that decision, Dr. Chenitz had explained that
... it would depend on the circumstances of the individual case. However, in the final analysis, procedures ordered in dialysis are ultimately the responsibility of the *225 nephrologist, but the discretion for ordering cardiac monitoring in, say a patient who was primarily the responsibility of the cardiologists, and who is being treated by the cardiologists for a cardiac condition, would be evolved in consultation with the cardiologists. It would not be appropriate for a nephrologist to singlehandedly determine the protocol for monitoring that kind of patient.
We think it plain that testimony of this tenor was highly relevant to the issue of Dr. Haddad's liability. There was certainly evidence from which the jury could have inferred that the dialysis order written by Dr. Haddad should have included an order for cardiac monitoring. After all, what went on in the dialysis unit was his responsibility, there was a cardiac monitor available there, and he certainly was aware that the dialysis nurses who execute the dialysis order take their instructions only from the dialysis order without reference to the complete chart. It is therefore inferable that had he not made the independent judgment that decedent did not need monitoring despite the fact that he was in the telemetry unit and had been monitored while on dialysis in St. Joseph's, he would have included monitoring in his dialysis order. As such, Dr. Chenitz's proffered testimony would have been the only unequivocal evidence in the case that even at St. Michael's, the decision about monitoring a patient such as decedent was, as a matter of proper medical practice and department policy, not the nephrologist's alone to make. We are also satisfied that the jury could well have inferred from the evidence that Dr. Haddad should have consulted with the cardiologists, and had he done so, they would have insisted on continuing the monitoring during dialysis with the probable result that decedent would not have died as and when he did. We have no doubt, therefore, that Dr. Chenitz's testimony was material. Since it was directly responsive to the testimony of Dr. Haddad and his expert, we are satisfied that it was an entirely proper subject for rebuttal.
We recognize that as a general rule the trial court has a wide range of discretion regarding the admissibility of proffered rebuttal evidence. See, e.g., Dalton v. Gesser, 72 N.J. Super. 100, 117, 178 A.2d 64 (App.Div. 1962). Nevertheless, it is clear that the court mistakenly exercises that discretion when, as here, its ruling unfairly prevents a plaintiff from attempting to rebut a material *226 predicate of the defense theory testified to on the defendant's case. We appreciate the judge's view that plaintiff had the option of calling Dr. Chenitz on her direct case. But we do not see why that should bar her from calling him as a rebuttal witness. No one on her case had testified that the nephrologist could properly make the decision about monitoring independently of the treating cardiologists. That did not come out until defendant's case. It was proper rebuttal, and we are satisfied that plaintiff was prejudiced by its exclusion.
Plaintiff also complains about being barred from using Dr. Chenitz's deposition testimony on her direct case as the deposition of a party pursuant to R. 4:16-1(b) and from being barred from so using it in the cross-examination of Dr. Haddad's expert. We understand that the reason for the court's exclusionary ruling was its perception that Dr. Chenitz was not an agent of the hospital for purposes of that rule. We conclude that he erred in this regard. Dr. Chenitz was the hospital's department chairman and was paid by it for his services in that position. Nevertheless we are satisfied that the issue with respect to the direct case is moot. Pursuant to R. 4:16-1(b), the deposition of an agent of an entity party may be used "by an adverse party for any purpose against the deponent or the corporation, partnership, association or agency" which is a party. The liability of the hospital, the only party defendant against whom the deposition would be so admissible, has already been adjudicated without that evidence. If the deposition witness is not unavailable at trial, the deposition is not admissible against any other party defendant except for impeachment purposes. Dr. Chenitz was obviously available and hence his deposition could not be used against Dr. Haddad.
We conclude differently with respect to the cross-examination of Dr. Haddad's expert. Any deposition may be used to impeach any witness. R. 4:16-1(a). Provided a proper foundation were laid, we see no reason why the expert could not have been confronted with Dr. Chenitz's view of the respective roles of the *227 nephrologist and the cardiologist in the monitoring decision when telemetry patients are dialyzed and why he could not have been asked to explain whether it was proper medical practice for the department policy to have been disregarded in this case.
For these reasons, we conclude that there must be a new trial with respect to Dr. Haddad's liability.
With respect to Nurse Forshage, we do not understand the dismissal as against her at the close of plaintiff's proofs. Plaintiff's nephrology expert, as we have noted, runs a dialysis unit in a major metropolitan hospital. Part of his responsibility is the supervision of nursing practices and standards. We think it plain that his area of expertise encompassed standards of nursing practice in the dialysis unit. He testified that when a dialysis nurse detects an irregular heartbeat, she is obliged immediately to so notify the physician. Nurse Forshage failed to do so when she noted decedent's irregular heartbeat before dialysis was started. The jury was free to find that that failure constituted a deviation from the applicable standard of care by a dialysis nurse and contributed to the tragic outcome of this dialysis treatment.
Plaintiff also argues that both nurses were negligent in not making more frequent checks of decedent's vital signs. The fact of the matter, however, is that Nurse Forshage left the unit before the cardiac arrest and that Nurse Matulac followed the unit's practice of vital-sign checks every twenty minutes or so. The actions of neither in this respect can be regarded either as deficient or causative.
Although we remand for a new trial on the liability of Dr. Haddad and Nurse Forshage, we consider issues related to the hospital's adjudicated liability. To begin with, we see no reason why that issue should be relitigated. None of the errors we have identified affects the question of the hospital's liability at all. We are also satisfied that there is no reason not to bind all parties to the damages award. The jury was instructed to set damages at an amount that would fairly compensate plaintiff for the total *228 losses she claimed. Questions as to the number of other parties responsible for those losses and how those losses should be apportioned among them if ultimately more than one is liable are entirely distinct from the question of what constitutes a proper compensatory verdict. The jury must be assumed fairly to have answered that question. In our view, the damages verdict cannot reasonably be regarded as tainted by the jury's decision that only one defendant was responsible. In short, we conclude that the liability issues and the damages issues were fairly separable. We see no reason, therefore, to retry the damages issue. See generally Caldwell v. Haynes, 136 N.J. 422, 442-443, 643 A.2d 564 (1994); Chattin v. Cape May Greene, Inc. [III], 243 N.J. Super. 590, 604, 581 A.2d 91 (App.Div. 1990), affirmed o.b., 124 N.J. 520, 591 A.2d 943 (1991); McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 173, 521 A.2d 851 (App.Div.), certif. denied, 108 N.J. 219, 528 A.2d 36, 37 (1987). Retrial of the liability issues will, of course, require a reapportionment of liability if either Dr. Haddad or Nurse Forshage is also found liable. For purposes of apportionment only  not for purposes of its own liability, which has already been adjudicated  the hospital too must be a party defendant at the retrial.
One final issue remains. Plaintiff argues that she was entitled to have the jury given an "ultimate outcome" charge, namely, an instruction that irrespective of the amount of the verdict returned against the hospital, the hospital was, as a matter of law and by reason of N.J.S.A. 2A:53A-8, only liable to pay $10,000. We considered but rejected the same argument in Johnson v. Mountainside Hospital, 239 N.J. Super. 312, 325, 571 A.2d 318 (App. Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990). There, plaintiff's decedent had died as the result of an allegedly defective respirator that was allegedly being improperly monitored while she was a patient at the hospital. He brought suit against the manufacturer, the hospital, and the medical personnel responsible for decedent's care. Prior to trial, plaintiff settled with the manufacturer. Following trial, the jury concluded that the manufacturer was eighty percent responsible, the hospital twenty percent *229 responsible, and the medical personnel not responsible at all. It returned a verdict of about $475,000. Plaintiff was entitled to recover only $10,000 of the hospital's approximately $95,000 share.
In rejecting plaintiff's argument that the jury should have been instructed as to the hospital's limited liability, this court had this to say:
Plaintiff was of the view that at trial defendants sought to cast the entire blame for the tragic disconnection of Mrs. Johnson's respirator upon the Hospital itself. If successful, that tactic would shield the individual defendants, whose potential liabilities, unlike that of the hospital, were unlimited. To counteract that tactic, plaintiff requested the trial judge to instruct the jury that if the hospital was negligent, plaintiff's recovery against it would be limited to $10,000. The trial judge declined to charge as requested. Plaintiff argues that this ruling was error. If the requested instruction was to have any effect upon a jury's verdict, it could only be to persuade the jury to shift to the other defendants some amount for which it had concluded the hospital, and not the other defendants, was justly responsible. By the enactment of N.J.S.A. 2A:53A-8, the legislature determined that, as a matter of social policy, an injured beneficiary of the hospital's works, can shift only a limited share of the consequences of the hospital's negligence to the hospital itself. But there is no reason to believe that a purpose of the statute was to shift any part of those consequences to other parties merely because they happen to be caught up in the same lawsuit as the hospital. We agree with the trial judge that a charge leading to that result would be unfair and inappropriate. In that respect, we think that the situation presented by this case is different from situations in which an ultimate outcome charge has been held to be required. See Roman v. Mitchell, 82 N.J. 336, 345-347, 413 A.2d 322 (1980); Dimogerondakis v. Dimogerondakis, 197 N.J. Super. 518, 485 A.2d 338 (Law Div. 1984). [Footnote omitted.]
[Johnson, 239 N.J. Super. at 325, 571 A.2d 318.]
Our reexamination of the Johnson holding leads us to a different view. It is certainly true, as Johnson points out, that the individual defendants may be prejudiced if the jury knows that the hospital is only liable to the extent of $10,000 since, in that case, the jury might be inclined, out of sympathy for the plaintiff, to attach liability to those whom it might otherwise find not liable at all. But there is another side to that coin. If the jury does not know that the hospital's liability is limited, it might just as well conclude that plaintiff's full recovery can be had against the corporate party, which it may well assume to have the deeper pocket, and it may therefore believe that it can more certainly *230 make the plaintiff whole without having to assign fault to individual doctors, nurses, and other staff members, who, although negligent, clearly intended no harm and who are hardworking and dedicated professionals doing difficult jobs under difficult circumstances. The point is therefore plain. The defendants may be prejudiced if the jury knows about the limited liability. The plaintiff may be prejudiced if the jury does not know. We believe that the most appropriate and the fairest resolution of this dilemma is for the jury to be instructed as to what the law is and to be given careful cautionary instructions on how to apply it.
In our view, the right of a plaintiff to an ultimate outcome charge in comparative negligence cases offers the closest and most instructive analogy. In dealing with that issue as a matter of first impression, the Supreme Court, in Roman v. Mitchell, 82 N.J. 336, 413 A.2d 322 (1980), concluded that with respect to the allocation of percentages of fault, a jury should not operate in a vacuum or based on a possible mistaken notion of how the applicable statute operates. This is so because "a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function." Id. at 346, 413 A.2d 322. (Emphasis added.) The Supreme Court has recently reaffirmed the principle that where the legal right of a plaintiff to recover the damages the jury has awarded is at stake, the jury can best and most fairly perform its fact-finding function if it understands exactly how the law applies to its verdict. Thus in Fischer v. Canario, 143 N.J. 235, 670 A.2d 516 (1996), the Court held that in a Scafidi[4] case, an ultimate outcome charge should be given for this reason:
The value of an ultimate outcome charge in lost-chance cases is that it informs the jurors of the effect of their causation apportionment. The charge makes clear to *231 jurors that they are to award full damages, and the trial court will make any necessary adjustments in light of their findings. Without the charge, there is the risk that the jurors will reduce their damage award in light of the apportionment of fault they find as part of their verdict. Then, once the trial court makes the same reduction, the plaintiff would receive an inadequate recovery. When a Scafidi damage-apportionment rule is applicable, an ultimate outcome charge generally should be given.
[Fischer, 143 N.J. at 254, 670 A.2d 516.]
Fischer makes it plain, moreover, that this extension of the ultimate outcome charge to Scafidi cases is a natural and ineluctable progression from Roman v. Mitchell, supra. Thus, the Fischer Court noted that in Roman,
[w]e emphasized that "a jury informed of the legal effects of its findings ... is better able to fulfill its fact finding function." Id. at 345-46, 413 A.2d 322. See also State v. Mejia, 141 N.J. 475, 485, 662 A.2d 308 (1995). ("As we have repeatedly stated, trial courts ... must inform juries of the effect of their findings." (citations omitted)); Campo v. Tama, 133 N.J. 123, 140, 627 A.2d 135 (1993). ("We have always emphasized that juries must understand the import of their findings.") (O'Hern, J., dissenting); Chavanne v. Clover Financial Corp., 206 N.J. Super. 72, 80-81, 501 A.2d 1024 (App.Div. 1985) (holding that ultimate outcome charge should be used to inform a jury of fact that its award will be subject to court's control until child reaches age of maturity); Dimogerondakis v. Dimogerondakis, 197 N.J. Super. 518, 485 A.2d 338 (Law Div. 1984) (holding that ultimate outcome charge, which would inform jury that any damages awarded to plaintiff in personal injury action would be molded to reflect only that percentage of liability which jury attributes to nonsettling defendant, was warranted).
[Fischer, 143 N.J. at 252, 670 A.2d 516.]
We see no fundamental jurisprudential difference between Roman and Fischer on the one hand and this case on the other. The underlying issue is the same, namely, how the jury's damages award, as a matter of substantive law, will translate into the plaintiff's right to recover it.
We reject the argument that a jury's knowing about the statutory limit on a hospital's liability is akin to its knowing whether or not a defendant is insured. Insurance goes to the question of whether a plaintiff, as a matter of fact, will be able to collect the damages the jury has awarded. The statutory limit on a hospital's liability, like comparative negligence and Scafidi apportionments, goes, however, to the issue of plaintiff's legal right to recover the damages awarded. It implicates, in Roman terms, a "legal effect *232 of [the jury's] findings." That is to say, there is a critical difference in the ultimate-outcome context between the question of whether a plaintiff will be able, because of defendant's resources, to obtain satisfaction of the judgment in his favor and the question of how much of that judgment plaintiff is entitled by law to have satisfied. We are further of the view that a clear barometer of whether a consequence of a jury's finding on damages is legal or factual is whether the judge must mold the verdict taking that finding into account. The verdict must be so molded in comparative negligence and Scafidi cases. It had to be so molded here to relieve the hospital of responsibility beyond its statutory liability. Obviously, however, the question of whether a defendant is insured or is otherwise able to satisfy a judgment he is obliged to pay is hardly a "molding" issue.
With respect to the "sympathy" factor that defendants fear, we say only this. Our entire system for the administration of justice is built upon our trust in the jury system and our abiding confidence that juries act conscientiously and diligently in following the instructions given them by the judge. We trust juries to find all kinds of facts  in life and death issues as well as the full range of less consequential ones. Our jurisprudence is committed to the proposition that juries can and will follow the judge's charge and will do so best if they understand the legal consequences of their findings. A jury's potential passion and prejudice that may favor one or the other of the parties can most effectively be averted by cautionary instructions accompanying a charge that tells it fully and correctly how the law will affect its findings of fact.
We add this final caveat. The 1991 amendment of N.J.S.A. 2A:53A-8 increases the hospital's liability limit to $250,000. If a trial court were to conclude from the proofs that a plaintiff's damages were unlikely to reach that amount, even if liability were proved, we have no doubt that the court would have the discretion not to give an ultimate-outcome charge.
*233 Having concluded, however, that this plaintiff was entitled to an ultimate-outcome charge, we address the question of the consequence of that right here. Clearly, the charge will have to be given following the new trial against defendants Dr. Haddad, Nurse Forshage, and the hospital. The question is whether the omission of the charge at trial constituted harmful error in respect of the remaining defendants, the three cardiologists, requiring retrial against them as well. We conclude that it did not. We are satisfied that the heavy weight of the evidence exonerating these doctors from wrongdoing makes it unlikely that the non-liability finding by the jury would have been affected by an ultimate-outcome charge. In short, as to these defendants, we are persuaded that the absence of the charge did not have a capacity to affect the outcome.
The partial summary judgments dismissing the complaint as to defendants Chenitz, Matthews, and Guma are affirmed. The order entered at the close of plaintiff's proofs dismissing the complaint as to Dr. Goldfarb and Nurse Matulac is affirmed. The order entered at the close of plaintiff's proofs dismissing the complaint as to Nurse Forshage is reversed. We reverse the judgment of no cause for action in favor of defendant Dr. Haddad. We affirm the judgment of liability against St. Michael's Medical Center and the damages award of $150,000. We remand for a new trial against Dr. Haddad, Nurse Forshage, and the hospital consistent with this opinion.
NOTES
[1] The events here occurred prior to the amendment of N.J.S.A. 2A:53A-8 by L. 1991, c. 187, which increased the original limitation of hospital's liability from $10,000 to $250,000, and all parties concur, as do we, that the original limitation applies.
[2] Each side also produced a neurologist. As we understand the record, it was the hospital's position that decedent had suffered a brain-stem stroke during dialysis, an event that cardiac monitoring could not have avoided and that would inexorably have caused the cardiac arrest, the brain damage, the coma, and the death. Plaintiff's expert neurologist testified that in her opinion decedent had not suffered a stroke but rather a cardiac arrest due directly to a heart problem. Had the jury accepted the hospital's brain-stem stroke theory, there could have been no finding of proximate cause. We take the view, therefore, that the jury rejected that theory and found that the failure of cardiac monitoring was the culpable proximate cause. We make, therefore, no further reference to the neurological experts or the stroke theory.
[3] We note that in addition to the monitoring question, plaintiff's expert also predicated his deviation from the prevailing professional standard on the potassium levels of the dialysis bath ordered by Dr. Haddad. This contention was disputed by Dr. Haddad and his expert with detailed explanations of the propriety of Dr. Haddad's order, and we deem it unlikely that a jury would have found Dr. Haddad to have been at fault in this respect. Moreover, plaintiff does not rely on this issue on appeal.
[4] Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990), holding that where negligent medical treatment is found to have increased the risk of harm posed to the patient by a pre-existing condition, the jury must determine, on a percentage basis, the extent to which the ultimate result is attributable to the pre-existing condition and the extent to which it is attributable to the patient's lost chance for continued life.