690 A.2d 674

DEBORAH TINDAL AND TOM TINDAL, PLAINTIFFS–APPEL-LANTS, v. JOHN SMITH, D.P.M., JOHN FREDA, M.D., AND SOUTH BRUNSWICK FAMILY PRACTICE, DEFENDANTS–RE-SPONDENTS, AND 'JOHN' JORGENSEN, M.D., DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued November 6, 1996—Decided March 26, 1997.

Before Judges PRESSLER, STERN and HUMPHREYS.

*Arthur G. Nevins, Jr.*, argued the cause for appellants (*Mr. Nevins*, on the brief and reply brief).

*Ann Marie Vaurio* argued the cause for respondents John Freda, M.D., and South Brunswick Family Practice (*Jackson, Vaurio & Buckley*, attorneys; *Ms. Vaurio*, on the brief).

*Dughi and Hewit*, for respondent John Smith (*Christopher J. Christie* and *Gary L. Riveles*, on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

This is another difficult case involving a claim of medical malpractice impacted by a pre-existing condition and assertions that the patient's health habits (specifically excessive smoking) contributed to her condition. Plaintiff contends that she devel-

oped Reflex Sympathetic Dystrophy (RSD) as a result of surgery that should not have been performed and, in any event, was negligently performed. We affirm the judgment for defendants.

Plaintiffs Deborah and Tom Tindal appeal from a judgment of "no cause for action" based on a verdict in favor of defendants. Plaintiffs also appeal from the denial of their motion for judgment *n.o.v.*, a new trial, or relief from judgment. They contend that "defendants were negligent in recommending and performing a bunionectomy" on Deborah (plaintiff) because it "was contraindicated by her known condition of Raynaud's phenomenon, a vascular disease." After the surgery, plaintiff developed RSD, a disease characterized by prolonged and intense pain long after the surgery was performed. Defendant John Smith, a podiatrist, performed the surgery in August 1989. Defendant John Freda, who practices with defendant South Brunswick Family Practice, cleared plaintiff for the surgery.

On this appeal plaintiffs principally contend that testimony concerning Deborah's medical condition and treatment after September 1993 should not have been excluded even though she failed to provide discovery thereof; that the trial judge should have enforced plaintiffs' subpoenas served on two doctors; that the jury charges and interrogatories were inappropriate and misleading; that the testimony of Dr. Szemere, a chiropractor, should have been admitted; that the defense summation was prejudicial; and that the judge erroneously denied them additional peremptory challenges.

The charge on proximate cause was erroneous. However, the jury found no negligence and the issues of negligence and proximate cause were distinct and separable. Under these circumstances and in the absence of prejudice, we find no reversible error in the giving of the erroneous charge on proximate cause. We also find that no error, alone or in the aggregate, warrants reversal in the circumstances and affirm the judgment.

## I.

After a ten-day trial, the jury found that plaintiff suffered "from either Raynaud's Syndrome or some other type of Vaso Spastic Condition" prior to the surgery, but that it was not "a contributing factor" to plaintiff's RSD. The jury further found that Freda and South Brunswick Family Practice had obtained plaintiff's "informed consent" before granting medical clearance for the bunion removal Smith performed and that Smith had obtained plaintiff's informed consent before performing the surgery. The jury also concluded defendants had not "deviat[ed] from accepted standards of medical practice." As we understand the record, the jury was asked to decide if the risks of surgery were adequately explained to plaintiff and whether the decision to perform the surgery was itself a deviation from proper medical care, as well as whether the surgery was negligently performed.

In March 1989 defendant John Jorgensen,[1] who was associated with defendant, the South Brunswick Family Practice, referred defendant to defendant Smith because of problems with her feet.

Plaintiff first saw Smith on May 23, 1989. She complained of pain and swelling in both feet. Plaintiff told Smith that she had had bunions for approximately two years and had previously seen a doctor for treatment.[2] She also told Smith that she possibly had Raynaud's phenomenon, a diagnosis which Freda had not confirmed. Plaintiff also advised Smith that she had no trouble healing after prior surgeries. After taking plaintiff's history and conducting an examination, including x-rays, Smith saw no indication that plaintiff was suffering from Raynaud's phenomenon or other circulatory problems.

---

[1] Jorgensen was never served, was no longer engaged in the practice and did not participate in the trial.

[2] Plaintiff had been treated by Dr. James Byrne, who concluded that she suffered from Raynaud's syndrome, treated her conservatively and recommended against surgery in light of her condition.

Smith diagnosed plaintiff as suffering from bunions on both feet and a spur on her left foot. He advised plaintiffs that surgery to remove the bunions was a viable alternative. However, he testified that he "offer[ed]" that plaintiff be evaluated by a vascular surgeon, but that plaintiff "rejected" this idea. According to plaintiff, she "was not informed of any of the risks of surgery other than general risks," never recommended further vascular testing and repeatedly reassured her that there was "nothing to worry about." Smith and plaintiff both testified that they agreed that Smith would obtain the records of Dr. Lev, a "circulatory diagnostic" expert who had previously cleared her for surgery. However, those records were not obtained before the surgery was conducted.

On June 30, 1989, plaintiff saw Smith for a preoperative visit. Smith had no specific recollection of what he told plaintiff; however, he testified as to his usual practice before this type of surgery. He informs patients how long the operation will take and how long the feet will take to heal. He also tells patients about possible complications, possible side-effects of medications, the risk of postoperative infections, swelling, numbness, and the possibility that the bones will not heal. In addition, he informs smokers, like plaintiff, of the potential for arterial spasm and limb loss because "nicotine constricts the arteries" and blood vessels. Smith testified that he believed plaintiff's "heavy smoking" "contributed to her problems."

Smith further testified that, as a result of their discussion, plaintiff "agreed to stop smoking," but indicated that this agreement was not a precondition to his operating. Plaintiff signed a consent form. Smith admitted that he did not tell plaintiff about the possibility that the surgery might aggravate Raynaud's phenomenon, arterial spasms or vasculitis.

Smith also gave plaintiff a form to be completed by her family physician before the surgery could be performed. On July 28, 1989, Jorgensen examined plaintiff and cleared her for surgery. According to plaintiff, Jorgensen assured her that he saw no

evidence of Raynaud's disease or any other circulatory problems. Jorgensen noted on the form that there were no cardiovascular problems. Freda also signed the form.

Smith removed the bunions from plaintiff's left foot on August 7, 1989, at the Princeton Medical Center. According to plaintiff, before the operation she told Smith that she had not quit smoking and Smith told her there was "no problem" proceeding with the operation. During the operation, Smith applied a tourniquet to the left ankle in order "to identify the small structures" of the foot and work in an "accurate, efficient," and rapid fashion. Smith "moved" two nerves, the medial dorsal cutaneous nerve and the lateral proper nerve to the great toe. The portion of the bone which forms the bunion was cut off and the remaining bone was pinned in a way to keep it from moving. The surgery lasted forty-three minutes. The tourniquet was in place for approximately forty-six to forty-seven minutes. After it was removed the foot immediately returned to a "pink and viable state." Smith thereafter dressed the wound with gauze and a prepackaged plaster splint, and covered it with an Ace bandage. Smith prescribed Percocet for pain. Plaintiff was discharged from the hospital later that day.

After the operation, plaintiff experienced severe pain which did not subside. On August 11, 1989, Smith removed the bandage and saw no sign of infection, only "minimal swelling and . . . bruising," and a "good alignment" of the big toe. He prescribed additional Percocet.

Plaintiff continued to see Smith because of pain and swelling in her left foot. Smith believed that plaintiff's foot was healing normally with a good alignment of the toes and found only the expected amounts of swelling and bruising and no signs of infection. He prescribed medication in light of plaintiff's complaints and the swelling he observed.

Smith removed the pins from plaintiff's foot on September 12, 1989. Smith subsequently diagnosed plaintiff as suffering from

RSD and prescribed anti-inflammatory drugs, sedatives, exercise, and physical therapy.

Plaintiff testified that she continued to feel pain and could not walk on her left foot. When the pain failed to improve, Smith referred her to the Jefferson Hospital Pain Clinic in Philadelphia. Plaintiff last saw Smith in April 1990.

According to plaintiff, she "sought treatment for her RSD from numerous other medical providers over the years," but obtained little relief. Her doctors told her that she suffered from Raynaud's phenomenon and RSD. She acknowledged on direct testimony that "[s]he was told by numerous doctors that quitting smoking might help ... but was never able to completely stop smoking."

Plaintiff offered the expert testimony of Dr. Clark D. Miller as an expert in podiatric medicine. Miller examined plaintiff on May 9, 1994 and reviewed plaintiff's medical records and x-rays. He testified that, while Smith performed the surgery "in more than a normal standard" and that it was "very well done," Smith deviated from the standard of care of podiatric medicine in six ways. First, Smith's decision to perform the surgery was a departure from the standard of care because the surgery was "unnecessary" because of plaintiff's vascular condition. Miller cited plaintiff's Raynaud's phenomenon, her weak pulse rate, and her cigarette smoking as reasons why the surgery should not have been performed. Second, Miller opined that Smith's failure to offer plaintiff "any long-term conservative treatments" as an alternative to surgery also constituted a deviation from the standard of care. Third, in view of plaintiff's preexisting Raynaud's phenomenon, Smith should have made sure she "had a lower extremity vascular exam by a vascular surgeon or vascular specialist" before performing surgery. Fourth, the use of the "pneumatic cuff" or tourniquet during surgery to occlude the blood coming down into the foot "was adding insult to this patient's condition by occluding her vessels." Fifth, "the postoperative bandage ... was too tight" causing nerve damage. Finally, Smith "failed to inform [plaintiff]

of the reasonable risk[s] and complications involved in her surgery prior to the operation." As a result, Miller expressed the opinion that "by the very nature of this mysterious disease of reflex sympathetic dystrophy, which could come in a sudden onset, [the RSD] was triggered by her unnecessary surgery."

Miller's prognosis for plaintiff's condition was "extremely guarded and probably will get worse." He noted that, as of the time of trial, plaintiff had not improved in the six years since the surgery and still had extreme pain in her left foot.

Plaintiff also offered the testimony of Dr. John Powers as an expert in "foot surgery, vascularity and general medical clearance for surgery." In addition to being a doctor, Powers is a lawyer admitted to practice in New York. Powers reviewed plaintiff's medical records and examined plaintiff's hands and feet on March 6, 1995, the day he testified at trial. This examination, which lasted "a couple of minutes," revealed that plaintiff had evidence of Raynaud's disease and Raynaud's phenomenon in her hands and feet. Powers also found that plaintiff experienced "burning pain" in her left leg which is consistent with the diagnosis of RSD.

Powers testified that Freda and Jorgensen departed from accepted medical standards in clearing plaintiff for the bunion removal surgery because they did not "hav[e] a proper evaluation" of the plaintiff and "did not consider that she had [a] vasospastic condition," particularly because she was a smoker and nicotine "causes vasoconstriction." Powers also stated that Freda and Jorgensen "should have found out that she didn't have a good trial of conservative therapy" as an alternative to surgery and should have advised her not to have the surgery until she stopped smoking and had the Raynaud's disease properly treated. Powers also said that Freda and Jorgensen should have contacted Smith and told him that plaintiff was a very high risk and that he should not operate on her. Powers also concluded that plaintiff's RSD was caused by the surgery and that Freda and Jorgensen could have stopped the operation by refusing to give clearance.

Powers also opined that Smith deviated from proper and accepted standards of medical care. Powers reasoned that plaintiff's symptoms from the bunions were relatively minor and that more conservative treatment, such as a change of footwear, should have been tried before surgery. Also, Smith should have tried "to control [the] Raynaud's Disease or this vasoconstriction ... before surgery." Further, Smith should have waited until plaintiff stopped smoking before operating. Powers also stated that Smith should not have used the tourniquet during surgery because plaintiff suffered from poor circulation and the tourniquet caused slower healing and greater bruising after the operation. He suggested that no tourniquet would have allowed the "blood to continue to flow through the leg," and that Smith could have used clamps and tied the bleeding vessels individually. Moreover, Powers stated that Smith should not have used a pressure bandage after the operation to bind the surgical wound. He felt the bandage further impeded blood flow to plaintiff's foot. Finally, Powers stated that Smith should have observed plaintiff more closely after the operation. Thus, according to Powers, Smith's departures from the reasonable standard of care substantially contributed to plaintiff's developing RSD.

Powers admitted on cross-examination that RSD is a rare complication of surgery and that he has never warned a patient about RSD prior to operating. He also admitted that plaintiff's smoking had a substantial affect on her continued complaints and problems.

Defendant Smith offered the testimony of Dr. Eliot D. Rosenstein as an expert in the field of internal medicine and rheumatology. Rosenstein testified that he treats Raynaud's Syndrome and RSD "frequently" as a rheumatologist. According to Rosenstein, it was difficult to determine from the records whether plaintiff was suffering from Raynaud's phenomenon, but his feeling was that she suffered from some other vasospastic disorder, best characterized as acrocyanosis. Rosenstein opined that Smith had no reason

to retest plaintiff's vascular condition before operating and that Dr. Lev's studies were sufficient.

Rosenstein further testified that there is no medical evidence that Raynaud's phenomenon directly causes or predisposes a patient towards RSD. He expressed the opinion, assuming that plaintiff does suffer from Raynaud's phenomenon, that it did not cause the postoperative RSD nor any other "complication of her surgery" and that she "had an adequate circulation" for surgery. Rosenstein also opined that there was no reason for Freda or Jorgensen not to approve the bunion surgery by Smith and concluded that plaintiff's RSD was caused by the trauma of the bunion surgery.

Defendant Smith also presented the testimony of Dr. Thomas Graziano as an expert in podiatric medicine. Graziano reviewed plaintiff's medical records, as well as depositions and interrogatories and testified that Smith's care of plaintiff was "in accordance with accepted medical standards." Graziano stated that Smith's vascular assessment was adequate and provided no "contraindication" to surgery, even though plaintiff was a smoker.

Graziano also testified that the use of a tourniquet is "appropriate" and normal during bunion surgery because it allows the surgeon to see everything clearly, "make accurate cuts," "control hemastatis [sic ]" and "dramatically" reduce operating time. Graziano further testified the post-operative recovery was "unremarkable," that use of the ace bandage was proper, and that the RSD "probably was a complication" of the surgery. However, Graziano also testified that the "complication" did not indicate that Smith "was negligent in his treatment of this patient."

Defendants Freda and South Brunswick Family Practice presented the testimony of Dr. Kevin R. Bell as an expert in internal medicine. As a result of his review of plaintiff's medical records and the pretrial discovery, Dr. Bell concluded that the care provided to plaintiff by Freda and Jorgensen "was fine" and that there was "no deviation from accepted standards." Bell explained that a surgical clearance should not constitute "a second surgical

opinion" as to the advisability of a surgical procedure. Rather, a surgical clearance is an opinion, usually from a family doctor, that the patient can withstand the surgery, but the clearing doctor is not "obligated to discuss the nature, benefits, and risks of the proposed surgical procedure as part of the medical clearance." Bell opined that plaintiff was "a healthy lady" at the time of the surgery and "there was no medical reason" not to clear her for surgery.

Bell also testified that there is no research which suggests that Raynaud's phenomenon causes RSD and even assuming plaintiff suffered from Raynaud's phenomenon, this condition would not have been a reason to deny medical clearance for surgery at the time it was conducted.

In their summation, plaintiffs argued that "[t]he major problem was that the surgery was done at all. The second problem is that it was done with a tourniquet. And the third problem is that the tight bandaging was used rather than other techniques post surgery." Plaintiffs also contended that "Dr. Smith should have and could have treated the Reynords [*sic* ]" and "[n]ot rush[ed] to surgery," and that smoking does not cause RSD. The defendants emphasized that plaintiff knew from Dr. Byrne, plaintiff's prior podiatrist, who had declined to operate, and Dr. Smith about the risks of surgery, that RSD does not flow from the Raynaud's condition and rarely follows from such surgery and, therefore, there was no need to discuss it as a specific risk, but that its development was a complication of the non-negligent professional services. Moreover, it was noted that plaintiff was in pain before as well as after the operation.

## II.

[Point II of the opinion is omitted from publication.]

## III.

Plaintiffs contend that the jury charges and interrogatories were "confusing and needlessly complex and misleading as given by the Court to the jury." According to plaintiffs:

The Court got bogged down in instructing the jury on the varying degrees of proof between proximate cause, 'contributing factor', and 'pre existing condition', versus taking the patient as the doctor finds her, and between pre existing condition, failure to mitigate damages, avoidable consequences and increased risk of harm.

The Court's instructions on departures from proper and accepted standards of medical care and causality spoke only in terms of increasing the risk of harm posed by the plaintiff's pre existing condition.'

In *Scafidi v. Seiler*, 119 *N.J.* 93, 108, 574 *A.*2d 398 (1990), the Supreme Court held that "[e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result." Where there is such proof, the doctor "must produce evidence tending to show that the [ultimate injury] could have been attributable solely to the preexistent condition, irrespective of defendant's negligence," *id.* at 113–14, 574 *A.*2d 398, and the jury must be instructed to determine, "on a percentage basis," the extent to which the ultimate result is attributable to the pre-existing condition and the extent to which it is attributable to the doctor's negligence in treating the patient. *Id.* at 114, 574 *A.*2d 398; *see also Weiss v. Goldfarb,* 295 *N.J.Super.* 212, 230 n. 4, 684 *A.*2d 994 (App.Div.1996).

The *Scafidi* Court concluded that the standard proximate cause instruction is misleading and confusing in a case in which a doctor's alleged negligence combines with a preexisting medical condition. *Scafidi, supra,* 119 *N.J.* at 102, 574 *A.*2d 398. Justice Stein reasoned that the standard charge on proximate cause "assumes that defendant's negligence *began* a chain of events leading to plaintiff's injury" which is not the case if plaintiff is suffering from a preexisting condition. *Ibid.* The Court, therefore, formulated a more relaxed test for causation in such cases:

[T]he jury is first asked to verify, as a matter of reasonable medical probability, that the deviation is within the class, *i.e.,* that it increased the risk of harm from the preexistent condition. Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we use the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes. The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the

preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.

[*Id.* at 109, 574 *A.*2d 398 (citations omitted).]

Plaintiffs, in essence, argue in this case that the *Scafidi* charge on causation should not have been given in this case because there was no evidence that the Raynaud's syndrome could have progressed into the RSD without the intervention of the surgery.[3] The judge found that the charge was appropriate because plaintiff claimed that Raynaud's was a preexisting condition and "you have to give the jury an opportunity to evaluate the deviations and ... whatever the doctors may or may not have done with respect to their knowledge of her preexisting condition."

However, the experts for both sides testified that the RSD could not have developed without the surgery. Thus, the preexisting Raynaud's syndrome could not, without the intervening surgery, have progressed into RSD. In contrast, the preexisting condition in *Scafidi* might have led to the ultimate injury, premature birth and death of the infant, with or without defendant's negligence. We, therefore, agree with plaintiffs that the *Scafidi* charge should not have been given.

The problem was compounded because the judge gave both a standard "but for" proximate cause charge and the "increased risk" *Scafidi* charge. In *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 549, 589 *A.*2d 1059 (App.Div.1991), relying on *Scafidi,* we stated that:

It is self-evident that in cases in which defendant's negligence combines with a preexistent condition, the standard charge on proximate cause could confuse or mislead the jury. In such a case, it is error to instruct the jury on the "but for" proximate cause test either alone or in combination with the substantial factor standard.

Plaintiffs also insist that the jury interrogatories were misleading. According to plaintiffs:

Once the jury determined that the 'pre existing condition' was not a contributing factor to the plaintiff's ultimate injury, (interrogatory No. 2, Pa 158) it was unlikely

---

[3] *Scafidi, supra,* is not cited or discussed in plaintiffs' brief or reply brief.

they would find any departure on the part of the doctors actually 'increased the risk of harm posed by Deborah Tindal's pre existing condition'.

· · · · · · · ·

The interrogatories as posed by the Court never allowed the jury to consider whether or not any departure of defendants proximately caused the ultimate RSD. The 'increased risk of harm' charge inextricably attached to the causality interrogators, numbers 8, 9, 14 and 15, invoked the proposition that the pre existing condition somehow posed an independent risk of harm in the first place, which somehow necessarily contributed to the plaintiff's injuries.

Interrogatory number two asked: "Was the pre-existing condition of Raynaud's Syndrome or other type of Vaso Spastic Condition a contributing factor to the plaintiff Deborah Tindal's ultimate injury?" [4] The jury answered in the negative. In their answers to interrogatories seven and thirteen, the jury also found that neither Freda, the South Brunswick Family Practice, nor Smith deviated from accepted standards of medical practice. As a result of those answers, the jury was directed not to answer interrogatories eight and fourteen which asked whether Freda, South Brunswick Family Practice, or Smith's "deviation increase[d] the risk of harm posed by Deborah Tindal's pre-existing condition" and interrogatories nine and fifteen which asked whether "the increased risk [was] a substantial factor in producing the ultimate injury?"

The problem with these interrogatories is that interrogatory two asked a question on causation before the jury was asked about deviation from a standard of care, and it appears that the jury was directed to consider that interrogatory before the subsequent ones. However, the jury was also instructed to answer interrogatories seven and thirteen irrespective of its answer to question two, and we can find no basis on which to conclude that the jury's finding of no negligence or deviation from the standard of care was adversely impacted by the placement of the interrogatory concerning the preexisting condition.

---

4 Plaintiffs did not object to jury interrogatory number two which they now attack. In interrogatory number three, the jury found that RSD was "the ultimate injury."

We cannot conclude that "the issues of negligence and causation issues [were] so interrelated" that a new trial on liability is warranted because of the erroneous instructions on proximate cause. *Ahn v. Kim et al.*, 145 *N.J.* 423, 434, 678 *A.*2d 1073 (1996). We recognize that when there are errors in trial proceedings requiring a new trial, there is a "general rule that issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues." This is because "negligence and causation generally intertwine." *Ibid.* But the Supreme Court has also made clear that "[w]hether issues are sufficiently separable to warrant a partial retrial ultimately depends on the circumstances of each case." *Id.* at 434–35, 678 *A.*2d 1073.

In *Ahn* the jury found that some defendants had been negligent and the Supreme Court held that plaintiff was entitled to rely on a presumption that her husband was dead in proving her wrongful death and survival action. *Id.* at 427, 439–41, 678 *A.*2d 1073. Thus, the Court held that plaintiff was entitled to a retrial of those claims against all defendants she sought to retry. Similarly, in *Conklin v. Hannoch Weisman*, 145 *N.J.* 395, 678 *A.*2d 1060 (1996), the Supreme Court also required a retrial of both negligence and proximate cause in a legal malpractice case where the jury found defendants negligent in representing plaintiffs and there was an error in the instructions as to proximate cause. There, the Supreme Court could not conclude "that the jury's finding of negligence was entirely distinct and separable from the issue of proximate cause," *id.* at 411, 678 *A.*2d 1060, essentially because the Court had "no way of knowing precisely what conduct" constituted the basis for the jury's finding of negligence. *Ibid.; see also Tobia v. Cooper Hosp. Univ. Med. Ctr.*, 136 *N.J.* 335, 341–43, 643 *A.*2d 1 (1994) (jury's finding that defendants had not been negligent did not render moot an incorrect charge on contributory negligence); *Kaplan v. Haines*, 96 *N.J.Super.* 242, 253–55, 232 *A.*2d 840 (App.Div.1967), *aff'd o.b.*, 51 *N.J.* 404, 241 *A.*2d 235

(1968) [5] (erroneous damages instruction did not constitute reversible error where jury rendered a verdict of no cause for action based on finding no liability following a proper charge on proximate cause).

Here, the erroneous instructions on proximate cause do not require a new trial because the verdict and judgment were premised on a finding of no negligence and, based on the evidence, the two issues were entirely distinct and separate. In his instructions to the jury, the judge charged on negligence separately from proximate cause and repeatedly explained that the jurors would not consider the latter unless they found "that either or both of the defendants in this case have departed from the accepted medical standard" or "were negligent." Moreover, when asked for any objections to the charge, plaintiffs indicated there was "one possible inconsistency" but felt "it would not crop up" and did not explain it. Defendants voiced objection based on their belief that the "different definitions of proximate cause," and particularly the reference to the "lower standard" regarding a "substantial factor," was prejudicial to them. We find no prejudice to plaintiffs.

[The balance of the opinion is omitted from publication.]

Accordingly, the judgment is affirmed.

---

[5] *Kaplan v. Haines* was overruled on other grounds in *Largey v. Rothman,* 110 *N.J.* 204, 213, 540 *A.2d* 504 (1988).