750 A.2d 189 (2000)
330 N.J. Super. 568
Jarrell McKENNEY, an infant by his Guardians ad Litem, Edward J. McKENNEY and Jannie McKenney; and Edward J. McKenney and Jannie McKenney, Individually, Plaintiffs-Appellants,
v.
JERSEY CITY MEDICAL CENTER; Jersey City Family Health Center; Krergrkrai Hasanee, M.D.; Alexander N. Prezioso, M.D.; Long-Gue Hu, M.D.; Euk Kim, M.D.; and Sipra De, Defendants-Respondents, and
Dilara E. Samadi, M.D.; Ahmad Khalili, M.D.; Janusz Mroz, M.D.; Johol Chan, M.D.; and Surachat Chatkupt, M.D., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 2000.
Decided May 10, 2000.
*193 Eric S. Lentz, Chatham, for plaintiffs-appellants.
Sam Rosenberg, Parsippany, for defendant-respondent Long-Gue Hu, M.D. (Reiseman, Sharp, Kelsey & Brown, attorneys; Mr. Rosenberg, of counsel and on the brief).
Judith A. Wahrenberger, Roseland, for defendant-respondent Euk Kim (Wahrenberger & O'Brien, attorneys; Ms. Wahrenberger, of counsel and on the brief).
William S. Mezzomo, Springfield, for defendant-respondent Krergrkrai Hasanee, M.D. (McDonough, Korn, Eichhorn & Boyle, attorneys; James R. Korn, of counsel; Mr. Mezzomo, on the brief).
Roger G. Ellis, Springfield, for defendant-respondent Sipra De (Bumgardner & Ellis, attorneys; Mr. Ellis, of counsel; Deborah Metzger Mulvey, of counsel and on the brief).
Craig S. Combs, Morristown, for defendant-respondent Alexander N. Prezioso, M.D. (Giblin & Combs, attorneys; Mr. Combs, on the brief).
Thomas H.E. Hallett, Bernardsville, for defendant-respondent Jersey City Medical Center and the Family Health Center (Mr. Hallett and Esme' Stockman, on the brief).
Before Judges BAIME, BROCHIN and EICHEN. *190 *191
*192 The opinion of the court was delivered by BAIME, P.J.A.D.
Jannie and Edward McKenney brought this action on behalf of themselves and their infant son, Jarrell McKenney, seeking damages for wrongful birth, wrongful life, and injuries sustained during delivery. Among those named as defendants were the Jersey City Medical Center (JCMC), the Family Health Center (FHC), physicians Krergrkrai Hasanee, Alexander Prezioso, Long-Gue Hu, and Euk Kim, and an ultrasound sonographer, Sipra De. Plaintiffs' claims of wrongful birth and wrongful life focused primarily upon Hasanee, Hu and De. Plaintiffs contended that these defendants were negligent in failing to detect a birth defect known as spina bifida, thus depriving Mrs. McKenney of the opportunity to terminate her pregnancy. Plaintiffs additionally contended that Hu, Prezioso and Kim deviated from accepted standards of medical practice, resulting in the vaginal delivery of Jarrell rather than a cesarean section. Because Prezioso and Kim were implicated only in the latter stages of Mrs. McKenney's pregnancy when abortion was allegedly no longer a viable option, plaintiffs' claim against them was confined to injuries allegedly caused by the vaginal deliveryharm separate and apart from Jarrell's pre-existent neural tube defect. In contrast, Hu's and De's liability was premised on plaintiffs' claims of wrongful birth, wrongful life and injuries suffered during Jarrell's delivery.
De was granted summary judgment prior to trial. Plaintiffs voluntarily dismissed their independent claim against the JCMC and the FHC, who remained defendants *194 solely on the basis of respondeat superior. The claim against Hasanee was dismissed at the close of plaintiffs' case. The jury found Hu negligent, but concluded that his negligence did not deprive Mrs. McKenney of the opportunity to obtain an abortion. The jury also found that Jarrell did not suffer additional injuries as a result of being delivered vaginally as opposed to a cesarian section. Hu, Kim and Prezioso were exonerated on this basis. Plaintiffs appeal. We affirm.

I.
This appeal has a tortuous history. The trial was protracted. The record is voluminous. We recite only the facts salient to the legal issues raised.
Mrs. McKenney became aware she was pregnant in April 1990. Her anticipated delivery date was December 8, 1990. Mrs. McKenney appeared for her scheduled appointment at the FHC on August 10, 1990. At that time, Mrs. McKenney was in the twenty-second or twenty-third week of her pregnancy. She was examined by Dr. Hasanee. Following the examination, Mrs. McKenney was instructed to undergo a sonogram. Although sonograms were generally performed at the FHC, the ultrasound machine was not working. Because the FHC was a clinical department operated by the JCMC, albeit in a separate building, the nurse told Mrs. McKenney to visit the eighth floor of the JCMC on August 13, 1990.
Mrs. McKenney appeared on the eighth floor of the JCMC at the appointed time. De, a certified ultrasound sonographer since 1988, performed the sonogram. At trial, it was explained that a level one, or basic, sonogram determines gestational age, fetal weight, head circumference and amount of amniotic fluid. A level two, or targeted, sonogram is a more sophisticated diagnostic tool that is generally performed when a specific risk to either the mother or the fetus has been detected. Because there was no reason to believe that Mrs. McKenney's pregnancy presented a peculiar problem or risk, De performed a level one sonogram. It was undisputed at trial that an ultrasound technician has neither the duty nor the expertise to interpret a sonogram. However, under JCMC's protocols, a doctor was to be notified if anything "questionable" appeared on the sonogram. In any event, Mrs. McKenney testified that De returned to the examination room accompanied by a doctor after the sonogram was performed. After De and the physician conferred, Mrs. McKenney was instructed to return to the eighth floor of the JCMC on Thursday, August 16, 1990.
In both her deposition and trial testimony, De had no specific recollection of having performed the sonogram on either August 13 or August 16, 1990. However, uncontradicted documentary evidence disclosed that De was the only ultrasound technician employed by the JCMC during this period. She conceded that she performed the sonograms on August 13 and August 16, 1990. At her deposition and during trial, De testified that she detected no sign of spina bifida on the ultrasounds. If a fetus has a neural tube defect, a midline defect of the vertebra, or spina bifida, there are associated changes of the brain at the top of the spinal column, leading to a partial collapse of the frontal part of the head. This "infolding" results in the head appearing "lemon-shaped," rather than oval. This is referred to as "lemon sign." Although plaintiffs claimed that the sonograms taken on August 13, 1990 exhibited the presence of a lemon sign, De testified at both her deposition and at trial that she did not detect it. She noted, however, the presence of a "membrane" associated with twins in one of the images. Because De had no special expertise in interpreting sonograms, and pursuant to JCMC's protocol, she referred the images to a doctor. De could not recall the identity of the physician to whom she gave the images for interpretation.
A notation, "[f]ollow-up study suggested," appears on one of the sonogram images *195 taken on August 13, 1990. In her deposition testimony, De denied that her handwriting appeared on the sonogram films. In any event, De did not dispute the fact that on August 16, 1990, Mrs. McKenney returned to the eighth floor of the JCMC and that she, De, performed a level one sonogram. Although a physician should have been on duty to interpret the sonogram taken, De was unable to find one. De thus gave the sonogram to the unit secretary for the doctor to sign. The notation, "[f]ollow-up study suggested," appears on a sheet accompanying the sonogram taken on August 16, 1990. In her deposition, De denied that she had written the notation.
We digress to note that summary judgment was granted in favor of De based upon the evidence we have described. Consistent with the view expressed by plaintiffs' expert, the Law Division judge concluded that De had no special expertise in interpreting sonograms, a task that the expert later testified was best left to specialists such as radiologists. The court further determined that De did not deviate from a recognized standard of care when she left the sonogram taken on August 16, 1990 in the file to be reviewed by a physician. In reaching this conclusion, the court stressed that De's conduct in leaving the sonogram with the unit secretary for review by a doctor comported with hospital protocols, and that plaintiffs had presented "no proofs" that De could be found "culpable" for this activity.
De's account of the events at trial, however, differed markedly from her deposition testimony. At trial, De admitted that she had written the notation, "[f]ollow-up study suggested," on both the sonograms taken on August 13, 1990 and August 16, 1990. De testified that on August 13, 1990, she made the notation at the direction of the physician to whom she had given the images for interpretation. According to De's trial testimony, the physician suggested that Mrs. McKenney's sonogram be reviewed by "a high risk" doctor. De further testified that she wrote the same notation on the sheet accompanying the sonogram taken on August 16, 1990, even though not at the direction of a physician. De explained that she "mount[ed] the page" on the sonogram with the expectation that it would ultimately be reviewed by a physician.
Although De's change of testimony in that respect can fairly be characterized as dramatic and substantial, we would be remiss were we to fail to note that English is not her native language. Moreover, uncontradicted evidence was presented that sonograms for high risk pregnancies were routinely conducted on Thursdays on the eighth floor of the JCMC. Thus, De's recollection of the reason for scheduling a sonogram on August 16, 1990 might have developed after her deposition was taken. Of course, we are not clairvoyant. We merely note that there are plausible, innocent explanations for De's change of testimony other than the sinister motivation ascribed to her by the plaintiffs.
Hu, the chief obstetric and gynecological resident at the JCMC, was assigned to the FHC for the month of August. It was undisputed that Hu made various notations in the report pertaining to the sonogram taken on August 13, 1990. More specifically, Hu wrote, "[r]ule out vanishing twin," and "[r]epeat ultrasound in four weeks." Hu also drew an arrow with the word "membrane," signifying his belief there were two sacks, an "abnormal finding." The reference to "vanishing twin" meant that Hu believed there had to have been two fetuses but one had died. According to Hu, the reference indicated that he intended to refer Mrs. McKenney for a level two sonogram, which would show in much greater detail any congenital malformation. Hu noted that there was nothing in the hospital's protocols or policies that required him to make certain that a targeted sonogram was ultimately performed. Although Hu testified that he had no independent recollection of evaluating any of *196 the sonograms taken on August 13, 1990, he testified that he told a technician a level two sonogram was necessary.
In both his deposition and trial testimony, Hu emphasized that his responsibilities did not include interpreting sonograms. Hu nevertheless conceded that he was familiar with how a neural tube defect would appear on an ultrasound. At his deposition, Hu testified that he did not review the sonogram for the purpose of interpretation, but instead because the technician needed a referral in order to conduct another sonogram. Hu admitted, however, that his signature on the sonogram report indicated that he was giving an opinion pertaining to the images on the ultrasound.
Hu's trial testimony differed from his deposition account respecting when he examined the August 13 sonogram. Hu testified that after his deposition but prior to trial he reviewed the hospital logbook and learned that the ultrasound machine at the FHC was not working in August 1990, and that Mrs. McKenney's ultrasound must have been conducted at the JCMC. Because he was assigned to the FHC in the month of August, Hu claimed that he could not have examined the sonogram on the day it was performed. Hu asserted that he was mistaken in his deposition testimony when he said he signed the sonogram report because the technician needed a referral in order to schedule a level two ultrasound. Hu testified at trial that he examined the sonogram and signed the report while assisting the attending physician some time after the ultrasound was taken. Because it took some time before sonograms conducted at the JCMC were delivered to the FHC, Hu contended that he must have reviewed the sonogram toward the end of August, not on August 13 as he had asserted in his deposition testimony. In any event, Hu admitted that a lemon sign appeared on the image of the fetus's head on the August 13, 1990 sonogram. The gist of Hu's testimony was that he first saw Mrs. McKenney's sonogram some time after her twenty-fourth week of pregnancy.
Mrs. McKenney's next appointment following the August 16 sonogram was on September 7, 1990. She was seen by Prezioso, an obstetrician and gynecologist, at the FHC. Prezioso testified that it was not his responsibility to interpret sonograms, although he was familiar with the fact that a "lemon-shaped" skull was a frequent indication of spina bifida. Because the sonogram reports did not contain a diagnosis, Prezioso ordered that an ultrasound be repeated. Prezioso admitted that the sonogram image contained in Mrs. McKenney's chart included a reference to "membrane" and that a membrane in the amniotic sac was consistent with a neural tube defect. At trial, Prezioso was shown several images from the August 13 sonogram which apparently were not contained in Mrs. McKenney's file when he examined her on September 7, 1990. Prezioso admitted that the shape of the fetus's skull was "troubling" and that he would have noted this abnormality had he seen the sonogram image on the date of Mrs. McKenney's visit.
Additional sonograms were performed thereafterone on October 2, 1990, and another on November 7, 1990. The record is unclear as to whether these sonograms were interpreted by physicians. Although Mrs. McKenney was referred to FHC's high risk clinic because of the possibility of twins and her age, no one apparently suspected the presence of a neural tube defect. After the possibility of twins was discounted, Mrs. McKenney's case was returned to FHC's regular obstetric clinic where on different visits she was attended to by Kim and Prezioso. On November 23, 1990, Prezioso ordered another ultrasound because Mrs. McKenney's chart contained no diagnosis of the images taken in prior sonograms.
The following day, however, Mrs. McKenney began having contractions and was admitted to the JCMC. Jarrell was delivered vaginally by Janasz Mroz, the *197 attending physician, and Johol Chan, a first year resident. Mrs. McKenney heard one of the doctors say, "[w]hat is this on his back that I busted," and then, "[i]t looks like a sac that I busted." Jarrell's ruptured myelomeningocele, a defect of the spine in which the spinal cord is malformed and exposed in a cystic structure, was three or four inches above the buttocks.
Jarrell was born with significant defects. His headsize was below the normal level; his kidney was undersized; his penis was malformed; he suffered from severe hip dislocation and clubbed feet; and he had water on the brain. In the ensuing years, Jarrell underwent nine operations. He still does not have bladder and bowel control, and he is unable to sit or walk without assistance. Mrs. McKenney testified that she would have terminated the pregnancy had she been informed of the neural tube defect.
Melvin Ravitz, a board-certified obstetrician, testified as plaintiffs' expert. According to Ravitz, Hasanee was negligent in failing to order an alpha fetoprotein (AFP) test and a targeted sonogram. An AFP test is generally used to detect spina bifida. Ravitz conceded, however, that it is most effective when administered between the sixteenth and eighteenth weeks of pregnancy and that it has very little, if any, value when performed in the twenty-second or twenty-third weeks of pregnancy. Ravitz also admitted that a basic, level one sonogram is considered adequate under guidelines published by the American College of Obstetrics, and that under generally recognized standards, a targeted, level two sonogram "was not indicat[ed]." The trial court granted Hasanee's motion for an involuntary dismissal on this basis.
Ravitz testified that Hu deviated from the applicable standard of care by failing to make a written request for a level two sonogram and by failing to make certain that such a request was carried out. Ravitz also surmised that Hu did not examine all of the images produced by the August 13, 1990 sonogram. Ravitz conceded, however, that he himself was not qualified to interpret ultrasounds. It was Ravitz's understanding that in 1990 an abortion was permitted "[u]p through [twenty-four] weeks of the pregnancy." The exact basis for this understanding is unclear. At one point, Ravitz testified that an abortion was not a "legal ... option" after the first twenty-four weeks of pregnancy. At another, Ravitz testified that abortions after the first twenty-four weeks were not considered an appropriate option because of the danger that the fetus had become "viable" at that stage. In any event, Ravitz testified that Mrs. McKenney would have had a "window" of approximately one or two weeks to terminate the pregnancy had the neural tube defect been properly diagnosed on August 13 or August 16, 1990.
According to Ravitz, termination of the pregnancy was not a practical or legal option by the time Prezioso and Kim attended Mrs. McKenney. Ravitz nonetheless claimed that Prezioso was negligent because he failed to insist that a radiologist or a perinatologist read and interpret the sonograms taken on August 13 and August 16, 1990. Ravitz asserted that Prezioso deviated from the applicable standard of care by merely ordering that additional sonograms be performed. Ravitz claimed that Kim was negligent for two reasons. First, Kim was the director of the FHC and was thus duty-bound to maintain a "continuity of care" for the clinic's patients. Ravitz testified that Kim violated that duty by failing to ensure that each physician who attended Mrs. McKenney was aware of the diagnostic tests that had been ordered and the results of those tests. Second, Kim had personally examined Mrs. McKenney late in the pregnancy. Ravitz claimed that Kim, like Prezioso, should have taken steps to have the sonograms taken earlier properly interpreted. Ravitz contended that Prezioso and Kim would have been aware of the presence of a neural tube defect, and armed with that knowledge should have *198 ordered a cesarian section rather than a vaginal delivery.
Plaintiffs also offered the testimony of Roger Berg as an expert in interpreting obstetrical ultrasounds. Berg testified that neural tube defects are detectable in almost all obstetrical ultrasounds. Berg described the lemon sign on the August 13 sonogram as "well depicted." Berg testified that an interpreter of this sonogram should have directed Mrs. McKenney to return to the hospital in an expeditious manner so that the possibility of a neural tube defect could be "confirmed or ruled out." According to Berg, Hu deviated from accepted standards of care by not noting the lemon sign and by failing to diagnose the neural tube defect through further study. Berg contended that Hu should have ordered a targeted sonogram so that the nature and extent of the fetus's spina bifida could be evaluated.
Daniel Adler, an expert in pediatric neurology, testified on plaintiffs' behalf. Adler claimed that Jarrell sustained avoidable injuries because he was vaginally delivered. Adler stressed that the "mode of delivery" had no effect on the "hydrocephal[ic]" condition of Jarrell's brain, his inability to control his bowel or bladder, or his club feet. However, he asserted that Jarrell's "hamstring and glutei function" would have been better had a cesarian section been performed. In addition, Jarrell's hips might not have dislocated but for the vaginal delivery.
We need not recount at length the evidence presented by defendants. Hu's expert witnesses testified that Hu, as a resident, was not responsible for interpreting the sonogram taken on August 13, 1990. They asserted that a resident could not reasonably be expected to be able to recognize a lemon sign because such a "finding is subtle in most instances." One of the experts conceded that a lemon sign appeared on one of the images taken on August 13. However, both experts assumed that Hu did not examine the image containing the lemon sign. Other defense experts testified that Prezioso and Kim did not deviate from recognized standards by failing to diagnose Jarrell's neural tube defect. They further claimed that Jarrell's neurological and physical defects were of a long-standing nature and were not the result of the method of delivery.
It is against this factual backdrop that we consider plaintiffs' arguments. Plaintiffs contend: (1) a mistrial should have been declared because the trial testimony of De and Hu substantially deviated from their deposition testimony, (2) the trial court erred by deciding as a matter of law that an abortion was not a viable option by the time the sonogram images were received by the FHC, (3) termination of the pregnancy was an available option to Mrs. McKenney as a matter of law, (4) Hu should have been estopped from asserting that he reviewed the August 13 sonogram subsequent to the date the ultrasound was conducted, (5) the trial court should have struck the charitable immunity limitation of damages provided by N.J.S.A. 2A:53A-8 because of intentional violations of the discovery rules by the JCMC and the FHC, (6) the trial court erred by granting Hassanee's motion for an involuntary dismissal, (7) the trial court should have shifted the burden of proof to defendants, (8) the jury should have been instructed that it could find the JCMC independently negligent, (9) the trial court committed plain error by failing to charge the jury on concurrent negligence, and (10) the trial court improperly instructed the jury on the issue of proximate cause. For the purpose of clarity, we address the issues presented in a different order than that advanced in plaintiffs' brief.

II.
We reject plaintiffs' claim that the trial court abused its discretion by refusing to declare a mistrial when De and Hu sharply deviated from their deposition testimony. We address the merits of these arguments separately as to De and Hu. Before we do *199 so, however, certain prefatory comments are in order.
We are troubled by the JCMC's argument that its attorneys were not obliged to inform plaintiffs' counsel of anticipated material changes in the testimony of De and Hu. The record does not indicate when JCMC's attorneys learned of De's prospective change of testimony. The record does indicate that JCMC's claims manager, Miriam Gonzalez, conferred with De after De's deposition but before De testified at trial. However, the record does not indicate whether De's change of testimony was a result of her conversations with Gonzalez or whether JCMC's attorneys were aware of this development before trial.
The same cannot be said of Hu's testimony. Hu acknowledged that at some point prior to trial, he reviewed the logbook and learned that the sonogram taken on August 13, 1990 was conducted at the JCMC and not at the FHC as he initially believed. This led him to conclude that he did not examine the sonogram images on August 13 but instead reviewed them toward the end of August after they were forwarded to the FHC. The record indicates that although Dr. Kim's attorney had physical possession of the logbook during the first week of trial, the logbook was not made available to plaintiffs' counsel until July 3, 1997. The judge barred the defense from using the logbook. Hu testified on July 15, 1997. It is difficult for us to believe that the attorneys for Hu and the JCMC were not informed of this development, Hu's prospective change in testimony, prior to trial. Careful examination of the attorneys' opening statements suggest that they were aware of it and anticipated Hu's newly adopted position that he examined the August 13 sonogram toward the end of August. We believe it axiomatic that the attorneys were duty-bound to inform plaintiffs' counsel of Hu's radical change of position.
In a related area, we have held that a party has a continuing duty to disclose the opinions of its experts and a failure to do so may, in the trial judge's discretion, result in the exclusion of that expert's opinion evidence. See, e.g., Waters v. Island Transp. Corp., 229 N.J.Super. 541, 548, 552 A.2d 205 (App.Div.1989); Fanfarillo v. East End Motor Co., 172 N.J.Super. 309, 312, 411 A.2d 1167 (App.Div.1980); Maurio v. Mereck Construction Co. Inc., 162 N.J.Super. 566, 569, 394 A.2d 110 (App.Div.1978); Hamilton v. Letellier Construction Co., 156 N.J.Super. 336, 338, 383 A.2d 1168 (App.Div.1978); Clark v. Fog Contracting Co., 125 N.J.Super. 159, 161, 309 A.2d 617 (App.Div.), certif. denied, 64 N.J. 319, 315 A.2d 408 (1973). Even if no written report is prepared, we have said that a party must disclose the substance of its expert's report in advance of trial. Clark v. Fog Contracting Co., 125 N.J.Super. at 161-62, 309 A.2d 617. Where, as here, an attorney knows that his client or a material witness intends to deviate from his deposition testimony in a crucial way, we believe that the attorney has an ethical obligation to convey that fact to his adversary.[1]
*200 Our procedures for discovery are designed to eliminate the element of surprise at trial by requiring a litigant to disclose the facts upon which a cause of action or defense is based. See Saia v. Bellizio, 103 N.J.Super. 465, 468, 247 A.2d 683 (App.Div.), aff'd, 53 N.J. 24, 247 A.2d 865 (1968). The search for truth in furtherance of justice is paramount. Caparella v. Bennett, 85 N.J.Super. 567, 571, 205 A.2d 466 (App.Div.1964). This basic principle is designed to ensure that the outcome of litigation shall depend on its merits in the light of all of the available facts, rather than on the craftiness of the parties or the guile of their counsel. Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338, 78 A.2d 705 (1951). By contrast, JCMC's position is akin to trial by ambush. Plaza 12 Associates v. Carteret Borough, 280 N.J.Super. 471, 477, 655 A.2d 961 (App.Div.1995). Although our rules of practice do not specifically provide that there is a continuing duty to disclose where it can reasonably be anticipated that a party or material witness will depart significantly from his or her deposition testimony, their purpose and spirit mandate such a course. We thus take this opportunity to make explicit what is plainly implicit in our discovery practice.
We have found no reported New Jersey opinion dealing with the precise issue. The Federal Rules of Procedure require a party to supplement its pretrial disclosures if it "learns that in some material respect the information disclosed is incomplete or incorrect...." Fed.R.Civ.P. 26(e)(1). Although the Advisory Committee's notes indicate that the provision establishing a continuing duty to disclose does not apply to deposition testimony, the express language of the Rule is not so limited. Moreover, the Rule has been said to apply where a party has deliberately concealed "new facts" inconsistent with its deposition testimony. Bunch v. United States, 680 F.2d 1271, 1281 (9th Cir.1982).
We think this is the correct position. An attorney is under a duty seasonably to apprise his adversary where he obtains information upon the basis of which he knows that his client's or witness's prior deposition was incorrect in a material respect when made, or he knows that the deposition, though correct when made, is no longer true in a material respect. We emphasize that this principle does not place a greater risk on an attorney than he now has when he learns of a significant change in a client's or witness's position. At present, an attorney's failure to apprise his adversary of such a change may result in sanctions, such as preclusion or the declaration of a mistrial.
Nor do we regard our conclusion as inconsistent with the attorney-client privilege. We have held that the privilege yields when confidential communications are made a material issue in a judicial proceeding. United Jersey Bank v. Wolosoff, 196 N.J.Super. 553, 567, 483 A.2d 821 (App.Div.1984); see also Kinsella v. Kinsella, 150 N.J. 276, 300-03, 696 A.2d 556 (1997); Weingarten v. Weingarten, 234 N.J.Super. 318, 330, 560 A.2d 1243 (App.Div.1989) (holding that wife waived attorney-client privilege to extent that her communications to her attorney were necessary to her husband's defense of her motion to vacate divorce settlement based on former husband's misrepresentations and to extent that information was not available elsewhere); Arena v. Saphier, 201 N.J.Super. 79, 88-89, 492 A.2d 1020 (App.Div.1985); Valentin v. Bootes, 325 N.J.Super. 590, 601, 740 A.2d 172 (Law Div.1998). The rule we have announced here applies only where a party has placed in issue a communication which goes to the heart of the claim in controversy. In that specific setting, the attorney-client privilege is pierced because the policy underlying the need for secrecy is outweighed by the interests of fairness and justice. See In re Koslov, 79 N.J. 232, 243-44, 398 A.2d 882 (1979). We perceive this as a minimal intrusion. As we stressed earlier, not every anticipated change of a person's deposition testimony *201 will require disclosureonly significant changes pertaining to a material issue.
We now turn to the question whether plaintiffs were prejudiced by De's or Hu's change of testimony.
A. De's Deposition and Trial Testimony
It will be recalled that De in her deposition testimony denied writing the phrase "[f]ollow-up study suggested" on the sonogram image taken on August 13 and on the sheet accompanying the August 16 ultrasound. At trial, she admitted having made these notations. De further recounted that she wrote these notations at the direction of a physician who she could not identify and that the doctor suggested Mrs. McKenney's case should be reviewed by a "high risk doctor."
Two questions are presented by De's change of testimony. The first is whether De's trial testimony raised a genuine issue of material fact concerning her liability, thus implicating the validity of the summary judgment entered before trial. The second is whether De's departure from her deposition testimony otherwise prejudiced plaintiff's right to a fair trial. We consider these issues seriatim.
De was granted summary judgment based on her deposition testimony. The issue, therefore, is whether De's admission that she wrote the notation at the direction of a physician who suggested Mrs. McKenney's case be reviewed by a "high risk" doctor provided a plausible basis for a finding of negligence. We stress that plaintiffs never moved to be relieved from the summary judgment. Moreover, we do not believe that De's change of testimony provided a reasonable basis for a finding that she deviated from an accepted standard of care as a sonogram technician. The fact that De wrote the notation "[f]ollow-up study suggested" added little, if anything to the case. It was undisputed that a sonogram technician does not have the expertise to interpret an ultrasound. Nor did plaintiffs either before or during trial claim that a sonogram technician owed a duty to ensure that a physician's order be carried outonly that it be communicated in accordance with hospital procedures. Thus, the fact that the unidentified physician suggested that Mrs. McKenney's case be reviewed by a high risk doctor did not create a duty on De's part to make certain that this suggestion be implemented. But even if it could be said that De was encumbered by such a duty, uncontradicted evidence was presented that she scheduled a new sonogram on August 16, a day in which high risk pregnancies were to be reviewed by obstetrical specialists. After the second sonogram was taken, De could not find the specialist on duty. She thus again placed the notation "[f]ollow-up study suggested" on the requisite sheet to be reviewed and signed by the attending specialist on duty. It cannot fairly be said that De breached a duty owed to the plaintiffs.
In reaching this conclusion, we recognize that communication of an unusual finding in an x-ray, so that it may be beneficially utilized, is often as important as the finding itself. The exigencies of the medical situation may call for different levels of response. In certain situations, direct contact with the treating physician is necessary beyond communication through administrative personnel. However, the manner of communication is often not so complex and technical that it should escape the comprehension of a lay jury merely because the expert testimony has not been presented.
In Jenoff v. Gleason, 215 N.J.Super. 349, 521 A.2d 1323 (App.Div.1987), for example, a radiologist did not communicate his findings relating to a lung tumor that appeared on a chest x-ray taken when the patient was hospitalized for a fractured wrist. In his reports, the radiologist recommended tomography of the area for further delineation and appropriate follow-up examinations. However, the reports arrived at the nurse's station after the patient had been discharged. The trial court *202 dismissed the plaintiff's complaint, concluding that the proper method of communicating a radiologist's finding as to the chest x-ray was a matter requiring expert testimony and that no testimony had been offered indicating a breach of duty. We reversed, holding that the absence of testimony explicitly outlining the applicable standard of care and the deviation was not invariably fatal to a cause of action sounding in negligence. Id. at 357-58, 521 A.2d 1323. We said, "[i]n the absence of ... direct testimony, the issue is whether there is other [evidence] from which the jury could determine the applicable standard and its violation." Id. at 358, 521 A.2d 1323. In vacating the dismissal and remanding for a new trial, we pointed to the testimony of the treating physician who stated that an unusual finding by a radiologist would normally be communicated to the attending doctor or surgeon. Ibid. We concluded that "there was sufficient evidence to present a jury question as to the appropriate method of communicating the radiologist's findings to the treating physician." Id. at 359, 521 A.2d 1323.
Here, plaintiffs cannot be faulted for failing to present expert testimony concerning De's conduct or misconduct.[2] The fact that De had been told that Mrs. McKenney's case involved a "high risk" pregnancy was not known by plaintiffs prior to trial. This much conceded, nothing in the record suggests that De violated a hospital protocol or a recognized standard of care by adding the notation "[f]ollow-up study suggested" to the sheet accompanying the August 16 sonogram and by leaving the file for the perinatologist's review. The evidence abounds the other way. The hospital protocol called for the sonogram technician to leave the sonogram with the unit secretary for review by the doctor on duty. Incontrovertible evidence established that De's conduct fully comported with this established hospital procedure. Thus, plaintiffs would have been unsuccessful had they moved to vacate the summary judgment. The summary judgment retained its validity notwithstanding De's change of testimony.
As to the second question, we are satisfied that plaintiffs were not prejudiced by De's change of testimony. A motion for a mistrial is addressed to the sound discretion of the trial court. Wright v. Bernstein, 23 N.J. 284, 296, 129 A.2d 19 (1957). "The power [to declare a mistrial] is to be exercised with the greatest caution." State v. Winter, 96 N.J. 640, 647, 477 A.2d 323 (1984) (quoting State v. Witte, 13 N.J. 598, 611, 100 A.2d 754 (1953)). It is generally undesirable that a trial be aborted and the parties be required to incur the expense attendant upon retrial. Battista v. Olson, 213 N.J.Super. 137, 143, 516 A.2d 1117 (App.Div.1986) (citing Runnacles v. Doddrell, 59 N.J.Super. 363, 367, 157 A.2d 836 (App.Div.1960)). By the same token, expedition should not be served at the expense of crippling the rights of one party or the other. Ibid. Absent an abuse of discretion, we generally defer to the decision of the trial judge who has had the opportunity to see and hear the witnesses, an opportunity that an *203 appellate court does not enjoy. Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 37, 711 A.2d 321 (App.Div.1998).
We find no abuse of the trial court's discretion. As we noted earlier, this was a protracted trial. While it is clear that plaintiffs were surprised by De's change of testimony, their attorneys were able to adjust to the new situation confronting them. See Lindenmuth v. Holden, 296 N.J.Super. 42, 685 A.2d 1351 (App.Div.1996), certif. denied, 149 N.J. 34, 692 A.2d 48 (1997). Counsel's cross-examination of De was withering. To this day, counsel has not effectively told us what steps he would have taken had he known of De's trial account at an earlier time. We are satisfied that plaintiffs were not prejudiced.

B. Hu's Deposition and Trial Testimony

At the outset, we note that plaintiffs never moved for a mistrial based upon Hu's change of testimony. However, they raised the question in their motion for a new trial. We thus consider whether Hu's change of testimony resulted in a miscarriage of justice.
We recognize that Hu's trial testimony concerning when he reviewed Mrs. McKenney's sonogram images pertained to an important issue in the case. If Hu examined the ultrasound toward the end of August, as he claimed at trial, Mrs. McKenney would have had little, if any, opportunity to terminate her pregnancy. It will be recalled that plaintiffs' expert, Ravitz, testified that an abortion was not a practical or legal option beyond the twenty-fourth week of pregnancy. Since the gestational age of the fetus was twenty-two or twenty-three weeks on August 13 when the original sonogram was conducted, the "window of opportunity" to abort the pregnancy might well have been closed by the time the sonogram images were returned to the FHC and examined by Hu. The jury found Hu negligent, but that his negligence was not a proximate cause of the alleged wrongful birth or life.
This much conceded, plaintiffs have presented nothing to indicate that they would have tried the case differently had they learned of Hu's chronology defense earlier in the proceedings. Counsel's cross-examination of Hu was highly effective. However, the simple and overriding fact is that it was undisputed that Hu was assigned to the FHC at the time the August 13 sonogram was conducted, and the uncontradicted evidence indicated that the ultrasound was taken at the JCMC. We cannot speculate upon the jury's deliberations, but it is probable that its finding of no proximate cause hinged upon the uncontradicted evidence that Hu was not assigned to the JCMC when the sonogram was taken. We thus find no basis to support plaintiffs' claim that they were denied a fair trial.

III.
Plaintiffs claim that the trial court erred by deciding as a matter of law that a resident of New Jersey could not legally obtain an abortion beyond the twenty-fourth week of pregnancy. The short answer to this argument is that the trial court rendered no such ruling. Plaintiffs' expert, Ravitz, testified unequivocally that a legal abortion could be performed only through the end of the second trimester. As we mentioned in our recital of the facts, the exact basis for Ravitz's conclusion is not altogether clear. At one point, Ravitz referred to state regulations allegedly barring abortions during the third trimester. At another, he asserted that physicians were unwilling to perform abortions beyond the twenty-fourth week because of the danger the fetus was viable at that stage. In any event, plaintiffs' attorneys tried the case on the basis that an abortion could not be performed during the third trimester. We note, however, that until the enactment of N.J.S.A. 2A:65A-5 to -7 barring "partial-birth" abortions, there *204 were no statutory restrictions on late term abortions in New Jersey.
Because plaintiffs' attorneys tried the case on the theory that an abortion was not an available option beyond the twenty-fourth week, the trial court took them at their word and tailored the jury instructions to the evidence presented. Plaintiffs have no cause to complain. Where parties without objection try and submit the question at issue upon a theory satisfactory to themselves, and suffer the case to go to the jury on that basis, it is too late to question the legal propriety of the course thus pursued. Kapherr v. Schmidt, 98 N.J.L. 803, 804-05, 121 A. 617 (E. & A.1923). Under our adversarial system, "the responsibility for the course which the proceedings take lies upon the contesting parties." State v. Atlantic City Electric Co., 23 N.J. 259, 264, 128 A.2d 861 (1957); see also Gebhardt v. Public Service Coordinated Transport., 48 N.J.Super. 173, 182, 137 A.2d 48 (App.Div.1957), certif. denied, 25 N.J. 540, 138 A.2d 79 (1958); Spear v. Lyndale Manufacturing Co., 35 N.J.Super. 385, 390, 114 A.2d 314 (App.Div.1955). We acknowledge that the rule that parties must adhere to the theory of law pursued in the trial court is not an inflexible one. See Spiegle v. Seaman, 160 N.J.Super. 471, 481, 390 A.2d 639 (App.Div.1978). We nevertheless conclude that the rule has particular applicability here in light of Ravitz's unequivocal testimony that in 1990 no reputable physician would perform an abortion during the third trimester.

IV.
We turn to plaintiffs' arguments attacking the trial court's jury instructions. Plaintiffs contend (1) the trial court should have shifted the burden of proof to defendants to establish their lack of negligence, (2) the failure to charge the jury on concurrent causes of injury constituted plain error, and (3) the charge on proximate cause improperly combined the "but for" and "substantial factor" tests. We are not persuaded by these claims.

A. Burden of Proof

Plaintiffs' argument that defendants bore the burden of proving their non-culpability rests on Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). There, during the course of a surgical procedure, the tip of a device used to perform a laminectomy broke off in the plaintiff's spinal canal and could not be retrieved, resulting in permanent injury. The plaintiff sued the hospital, the doctor who performed the surgery, the manufacturer of the surgical instrument, and the distributor. Our Supreme Court held that the jury should have been instructed that the failure of any defendant to prove lack of fault would trigger liability. Id. at 298, 338 A.2d 1. The Court acknowledged that "[i]n the ordinary case, the law will not assist an innocent plaintiff at the expense of an innocent defendant." Ibid. However, the Court concluded that on the facts before it, the interests of justice militated in favor of shifting the burden of proof. Ibid. Among the facts considered critical to this conclusion were the case involved "an unconscious or helpless patient," the mishap was "not reasonably foreseeable and unrelated to the scope of surgery," and the injury would not have occurred but for the negligence or fault of one or more of the defendants. Ibid. The Court characterized its decision as one "akin to res ipsa loquitur," or "conditional res ipsa loquitur." Id. at 299-300, 338 A.2d 1. The Court reasoned that in such a situation, "[a] wholly faultless plaintiff should not fail in his cause of action by reason of defendants who have it within their power to prove nonculpability but do not do so." Id. at 305, 338 A.2d 1.
More recently, in Chin v. St. Barnabas Medical Center, 160 N.J. 454, 734 A.2d 778 (1999), the Court reaffirmed its holding in Anderson and held that the "entire burden of proof" not merely the burden of going forward, "shift[ed] to the defendant." The *205 factual pattern in Chin "mirror[ed] that presented in Anderson v. Somberg." Id. at 465, 734 A.2d 778. During a hysteroscopy, the faultless patient died from an air embolism when nitrogen gas entered the uterus as the direct result of an incorrect hook-up of the hysteroscope. No explanation other than the negligence or fault of one of the attending physicians and nurses sued was available as the cause of the accident. The Court said that a claimant "must show three things in order to shift the burden of proof to the defendants." Ibid.
First, the plaintiff must herself be entirely blameless. The fact pattern to which the principles of Anderson most readily apply is where a plaintiff was `clearly helpless or anesthetized.' Second, the injury must be one that bespeaks negligence on the part of one or more of the defendants. Third, all the potential defendants must be before the court. That is, all those defendants who participated in the chain of events causing plaintiff's injury must be represented.

[Ibid.]
If these requisites are met, the jury is to be instructed that at least one of the defendants must be found liable and that the defendants bear the burden of exonerating themselves from liability.
In this case, we have no doubt but that Mrs. McKenney was without fault. However, it is arguable that the failure to diagnose the neural tube defect does not necessarily bespeak negligence. Nor were all of the potentially negligent parties before the court. Where, as here, there is no evidence as to where the culpability of multiple defendants lies, application of a burden-shifting rule would "impose an equal hardship on an innocent defendant as on an innocent plaintiff." Blitz v. Hutchinson, 252 N.J.Super. 580, 588, 600 A.2d 485 (App.Div.1991). We perceive no error in the trial court's refusal to shift the burden of proof to defendants.

B. Concurrent Negligence

Equally unpersuasive is plaintiffs' argument that the trial court committed plain error by failing to instruct the jury on concurrent negligence. A brief description of the law pertaining to concurrent causes is necessary for a full understanding of plaintiffs' contention.
The applicable principles are well settled. When instructing a jury on proximate cause, trial courts must distinguish between the routine tort cases and cases where concurrent causes of harm are present. Camp v. Jiffy Lube No. 114, 309 N.J.Super. 305, 309, 706 A.2d 1193 (App.Div.1998). In the former, "the law requires proof that the result complained of probably would not have occurred `but for' the negligent conduct of the defendant." Ibid. (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 417, 678 A.2d 1060 (1996)). In the latter, the law requires consideration of the "substantial factor" test. Ibid. The "but for" standard concentrates on one cause that sets the other causes in motion, while the "substantial factor" test recognizes that a tortfeasor will be held answerable if its negligent conduct was a substantial factor in bringing about the injuries. Conklin v. Hannoch Weisman, 145 N.J. at 419, 678 A.2d 1060. In the latter circumstance, "[a]lthough the law of negligence recognizes that there may be any number of concurrent causes of an injury, `[n]evertheless, these acts need not, of themselves, be capable of producing the injury; it is enough if they are a "substantial factor" in bringing it about.'" Id. at 419-20, 678 A.2d 1060 (quoting Scott v. Salem Cty. Mem. Hosp., 116 N.J.Super. 29, 33-34, 280 A.2d 843 (App.Div.1971)).
We now turn to the trial court's instructions. The jury charge given in this case included an instruction on the "substantial factor" test. However, that reference was made in the context of explaining the concept of "but for" causation. Specifically, the trial court charged the jury:

*206 [I]f you find that one or more of the defendants has departed from the accepted standard of care, then you must determine whether such deviation or negligence was a proximate cause of any loss sustained by the plaintiff in this case.
....
By proximate cause it is meant that the negligent conduct of a party was an efficient cause of the loss, that is, a cause which necessarily set the other causes in motion and was a substantial factor in bringing the loss about. It is defined as a cause which naturally and probably led to and might have been expected to produce the loss or damages complained of.
The trial court proceeded to the issue of damages with respect to plaintiffs' causes of action for wrongful birth and wrongful life.
In the event you find from the evidence that Dr. Hu was negligent, that is, that he deviated from accepted standards of medical care, and that as a result thereof, Jannie McKenney was deprived of the opportunity to terminate her pregnancy in the second trimester, and that Jannie McKenney would have elected to terminate her pregnancy, then plaintiff is entitled to damages as follows....
1. Plaintiff Jannie McKenney is entitled to the necessary and reasonable extraordinary expenses that she will incur in caring for and obtaining medical care for Jarrell from the present until Jarrell is 18 years of age. There's no claim being made in this case for past expenses. There's no evidence on past expenses or no claim has been made for that.
2. Plaintiff Jannie McKenney, as guardian for Jarrell, is entitled to the necessary and reasonable extraordinary expenses that Jarrell will incur in caring for himself and obtaining medical care for himself from the time he is 18 throughout the remainder of his life.
3. You may find that plaintiff Jannie McKenney is entitled to damages for the emotional distress she has endured as a result of having borne a child with spina bifida and will continue to endure into the future. The measure of damages is what a reasonable person would consider to be adequate and just under all the circumstances to compensate the plaintiff for this emotional distress.
As to plaintiffs' claim that the vaginal delivery caused injuries to Jarrell beyond those associated with his spina bifida condition, the trial court charged:
[I]n the event that you find from the evidence that Dr. Hu was negligent and that, in addition, as a result of that negligence, Jarrell McKenney was born vaginally rather than by C-section, then Jannie McKenney both individually and as guardian for Jarrell McKenney is entitled to the reasonable and necessary extraordinary expenses that you might find were proximately caused by the vaginal birth.
As you know, there is a conflict in testimony as to whether or not there is any effect upon Jarrell by being born vaginally as opposed to by C-section. In any event, if you assess damages for the increasefor increased harm caused by the vaginal birth, you will find these damages and assess these damages in one of two ways....
When it comes to Dr. Prezioso and Dr. Kim, any damages assessed against either of them are limited to the reasonable and necessary extraordinary expenses to be incurred as a result of the vaginal birth. Therefore, if you find as a fact that neither Jannie nor Jarrell will incur any increased expense due to the vaginal birth, you will not even have to address whether or not Dr. Prezioso or Dr. Kim deviated from accepted standards of medical care.
However, if you find that Dr. Prezioso and Dr. Kim, or either of them, did deviate from accepted standards of medical *207 care, as I've defined that for you, and proximately caused increased harm because of Jarrell's vaginal birth, then if you have not already done so, you should assess the damages for the increased necessary and reasonable expenses incurred by reason of the increased harm due to the vaginal birth.
Plaintiffs contend that the trial court erred by failing to tell the jury specifically it could find Hu liable even if his negligence was only one of several concurrent causes as long as it was a substantial factor in causing a wrongful birth or wrongful life. It is argued that by limiting the damage portion of its charge on wrongful birth and wrongful life to Hu, the trial court rendered nugatory its prior reference to "substantial factor." Plaintiffs further assert that the jury could have found other non-parties negligent, and thus it was incumbent upon the trial court to make it clear that Hu could be found liable if his negligence was only one of several concurrent causes of Jarrell's wrongful birth or wrongful life. In support of this contention, plaintiffs refer to comments made by defendants' attorneys in their summations. Plaintiffs interpret these comments as referring to De's negligence and that of other doctors who were not made party defendants in the suit.
We are satisfied that the trial court's instructions did not deprive plaintiffs of a fair trial. The trial court instructed the jury that it was to consider only Hu's conduct in determining plaintiffs' claims for wrongful birth and wrongful life. The court barred counsel from arguing or suggesting that De or others might have been responsible for the failure to diagnose Jarrell's neural tube defect with respect to the claims of wrongful birth and wrongful life. We do not find that defendants' attorneys disregarded this instruction, as plaintiffs claim. The instruction given by the court did not "improvident[ly] concentrate[ ]" on the need for the jury to find an "exclusive cause" for plaintiffs' unfortunate plight. Camp v. Jiffy Lube No. 114, 309 N.J.Super. at 310, 706 A.2d 1193. Instead, the charge properly distinguished the wrongful birth and wrongful life claims which were confined to Hu, from plaintiffs' other causes of action, which pertained to Prezioso and Kim.
We stress that plaintiffs did not submit a request to charge on the subject. Nor did they interpose a timely objection to the instruction given. It may be fair to infer from the failure to object below that in the context of the trial, the error belatedly raised here was actually of no moment. We are convinced that the trial court did not commit error. But even if we are wrong in that conclusion, we are entirely satisfied that the error was not capable of producing an unjust result. R. 2:10-2.

C. Increased Risk of Harm

Plaintiffs next contend that the trial court's instructions erroneously combined "but for" causation and "substantial factor" causation. Although ambiguously phrased, plaintiffs' argument rests on the thesis that the negligence of Hu, Prezioso and Kim combined with Jarrell's preexistent neural tube condition to cause disabilities separate and apart from those associated with the child's neural tube defect. Plaintiffs assert that several of Jarrell's physical and mental deficits could have been avoided had Hu, Prezioso and Kim diagnosed the fetus's spina bifida and ordered a cesarian section rather than a vaginal delivery.
To recover damages, a plaintiff must prove that the defendant's negligence was a proximate cause of the injury sustained. Catto v. Schnepp, 121 N.J.Super. 506, 511, 298 A.2d 74 (App.Div.), aff'd o.b., 62 N.J. 20, 297 A.2d 841 (1972). As we noted earlier, where "the plaintiff's injury can be traced to a single cause, the standard instruction on proximate cause ... describes it as `a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about ...,' and further as a `cause which naturally and probably led to and might *208 have been expected to produce the [ultimate harm].'" Scafidi v. Seiler, 119 N.J. 93, 101, 574 A.2d 398 (1990) (quoting Model Jury Charges (Civil) § 7.11). For the sake of convenience, we describe this standard instruction as the "but for" test. This standard assumes that the defendant's negligence began a chain of events leading to the plaintiff's injury. The principal thrust of the standard is to limit legal responsibility to those causes which are so closely connected with the result that the law is justified in imposing liability. Caputzal v. The Lindsay Co., 48 N.J. 69, 79, 222 A.2d 513 (1966); see also Brown v. United States Stove Co., 98 N.J. 155, 484 A.2d 1234 (1984); Griesenbeck v. Y.G. Walker, 199 N.J.Super. 132, 139, 488 A.2d 1038 (App.Div.), certif. denied, 101 N.J. 264, 501 A.2d 932 (1985).
Where, however, the plaintiff has a preexistent injury or disability and is then adversely affected by a defendant's negligence, the jury could be confused by a "but for" instruction as to causation. Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 29, 678 A.2d 271 (App.Div.1996). In order to avoid that possibility, our Supreme Court in Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398, held that "[i]f a plaintiff has a preexistent injury or disability and is then adversely affected by a defendant's negligence, the standard by which the jury evaluates causation must be expressed in terms consistent with the operative facts." Id. at 102, 574 A.2d 398. The Court explained that this "modified standard of proximate cause is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harmas distinguished from cases in which the deviation alone is the cause of the harm." Id. at 108-09, 574 A.2d 398. The jury is first asked whether, as a matter of reasonable medical probability, the physician's negligence increased the patient's risk of harm flowing from the underlying disease or injury. Id. at 109, 574 A.2d 398. Assuming the jury makes this finding, "we use the `substantial factor' test of causation because of the inapplicability of `but for' causation to cases where the harm is produced by concurrent causes." Ibid. The substantial factor standard is more lenient than the traditional "but for" test of causation. The more rigorous "but for" standard requires proof that the defendant's failure to treat the preexistent condition "was a probable cause of the resultant injury." Id. at 107, 574 A.2d 398 (emphasis in original). In contrast, the "substantial factor" test requires only that the physician's deviation, in the context of the preexistent condition, "was sufficiently significant in relation to the eventual harm [as] to satisfy the requirement of proximate cause." Id. at 109, 574 A.2d 398. It is self-evident that in cases in which the defendant's negligence combines with a preexistent condition, the standard charge on proximate cause could confuse or mislead the jury. Id. at 102, 574 A.2d 398. "In such a case, it is error to instruct the jury on the "but for" proximate cause test either alone or in combination with the substantial factor standard." Battenfeld v. Gregory, 247 N.J.Super. 538, 549, 589 A.2d 1059 (App.Div.1991); see also Ginsberg v. St. Michael's Hosp., 292 N.J.Super. at 30, 678 A.2d 271.
As we noted, plaintiffs assert that the trial court committed this error by charging the jury on both "but for" and "substantial factor" causation. We perceive the issue somewhat differently. Although defendants requested a Scafidi-type instruction dealing with the increased risk of harm emanating from the mode of delivery, plaintiffs apparently objected to such an instruction. Significantly, no such charge was given. Only the standard "but for" test of proximate cause was contained in the trial court's instructions.
The question then is whether the trial court erred by refusing to instruct the jury in terms consistent with Scafidi. Scafidi involved a claim that the defendant's medical malpractice in failing to properly treat and arrest early labor proximately caused the premature birth and *209 death of the plaintiff's infant child. 119 N.J. at 96, 574 A. 2d 398. The factual question presented was whether the infant's premature birth and death could have been avoided by proper treatment. Ibid. In that situation involving a lost chance of survival, the Court held that a "but for" standard of proximate causation was not sufficiently protective of the plaintiff's rights. Id. at 109, 574A.2d 398. In that context, cases requiring the Scafidi-type instruction generally involve "situations where a health care provider deprives a patient of a significant chance for recovery by negligently failing to provide medical treatment...." Scafidi v. Seiler, 119 N.J. at 108, 574 A. 2d 398 (quoting McKellips v. Saint Francis Hosp., Inc., 741 P. 2d 467, 474 (Okla.1987)). In such cases, it has been said that "the health care professional should not be allowed to come in after the fact and allege that the result was inevitable inasmuch as that person put the patient's chance beyond the possibility of realization." Ibid. A more lenient proximate cause standard is applied because "[h]ealth care providers should not be given the benefit of the uncertainty created by their own negligent conduct." Ibid.
In contrast, this case does not involve negligence resulting in a lost chance of survival or a reduced chance of harm caused by a preexistent condition. Under plaintiffs' theory of liability, the preexistent condition could not, without the intervening vaginal delivery, cause the resultant harm. There is no evidence in this case that defendants' negligence "increased the risk of the occurrenceof the ultimate eventuating harm by failing to arrest the patient's downward medical course." Battenfeld v. Gregory, 247 N.J.Super. at 547, 589 A. 2d 1059.
To that extent, this case bears resemblance to Tindal v. Smith, 299N.J.Super. 123, 690 A. 2d 674 (App.Div.1997). There, the plaintiff sued her doctors contending that she developed reflex sympathetic dystrophy (RSD) as a result of surgery that allegedly should not have been performed. Plaintiff suffered from Raynaud's phenomenon, a vascular disease. Although that fact was communicated to the plaintiffs' doctors, they advised her to undergo surgery to remove bunions from her feet. After the surgery, plaintiff developed RSD, a disease characterized by prolonged and intense pain. The experts for both sides testified that RSD could not have developed without the surgery. Perceiving that the plaintiff's medical malpractice claim was impacted by a preexistent condition, the trial court charged the jury in accordance with Scafidi, but also included in its instructions the standard "but for" proximate cause principle. Following a verdict in favor of the defendants, plaintiff appealed. We reversed. Writing for the court, Judge Stern first held that it was error to charge the jury on "increased risk" and "substantial factor." Id. at 135, 690 A. 2d 674. In reaching this conclusion, the court emphasized the undisputed testimony that "the RSC could not have developed without the surgery." Ibid. The court thus reasoned that "the preexisting Raynaud's syndrome could not, without the intervening surgery, have progressed into RSD." Ibid. In distinguishing Scafidi, Judge Stern noted that the "preexisting condition [in that case] might have led to the ultimate injury, premature birth and death of the infant, with or without defendants' negligence." Ibid.
With this as a backdrop, we are of the view that the trial court did not err by failing to give a Scafidi-type instruction on proximate cause. Plaintiffs' claim did not rest on the thesis that the vaginal delivery failed to arrest the effect of a preexistent conditionspina bifida. Plaintiffs contended instead that the vaginal delivery itself caused injuries that otherwise would not have been sustained.
For the sake of completeness, however, we add that the result would be the same even if error was committed. Plaintiffs' experts were able to compartmentalize the injuries and consequent disabilities *210 allegedly arising out of the vaginal delivery. Throughout the trial, the witnesses sharply distinguished between the physical and mental deficits associated with spina bifida and the injuries allegedly caused by the vaginal delivery. The jury found that the failure to order a cesarian section had no impact on Jarrell's ultimate condition. We are thus satisfied that if error was committed, it was clearly harmless. Plaintiffs, who did not seek a Scafidi-type instruction, have no cause to complain.

IV.
Plaintiffs' remaining contentions clearly lack merit and do not warrant extended discussion. R. 2:11-3(e)(1)(E). We offer the following brief comments.
We are wholly unpersuaded by plaintiffs' claim that Hu should have been estopped from testifying that he examined the August 13, 1990 sonogram some time after it was taken. Plaintiffs rely on N.J.A.C. 8.43G-15.2(b) which provides that "[a]ll entries in the patient's medical record shall be written legibly in ink, dated, and signed by the recording person ...." As we understand plaintiffs' contention, it is asserted that Hu, by failing to note the date of his review of the sonogram, should have been barred from claiming that he reviewed the ultrasound on a day other than that in which it was conducted. Plaintiffs cite no reported decision supporting their claim, and we have found none. The trial court read the regulation to the jury and charged that it could consider a violation of that standard of conduct as evidence of negligence. We are satisfied that this was the correct approach.
We reject plaintiffs' argument that the trial court should have struck JCMC's defense of charitable immunity because of the hospital's discovery violations. Again, plaintiffs offer no precedent supporting their position, and our independent research discloses no reported opinion allowing a trial judge to ignore the will of the Legislature as expressed in N.J.S.A. 2A:53A-8. The trial court imposed appropriate sanctions respecting the hospital's failure to provide discovery in a timely manner. While we do not endorse JCMC's gross inattention to our rules dealing with discovery practice, we are convinced that plaintiffs were not prejudiced.
We add that we find no basis for plaintiffs' related claim that the trial court erred by failing to instruct the jury on the question of the independent negligence of JCMC. As we noted earlier, plaintiffs told the trial judge at the outset of the trial that their sole cause of action against the hospital was based on the theory of respondeat superior. The trial court's instructions were tailored to plaintiffs' theory. Plaintiffs have no cause to complain.
Finally, we are satisfied that Hasanee was properly granted an involuntary dismissal. Plaintiffs' expert, Ravitz, testified unequivocally that alpha fetoprotein testing would not have yielded reliable results given the fetus's composite age. Ravitz also testified that a level one sonogram would disclose a lemon sign. In fact, the August 13, 1990 ultrasound did reveal the possibility of a neural tube defect. Succinctly stated, no evidence was presented supporting plaintiffs' claim that Hasanee deviated from accepted standards of care and that such negligence was a proximate cause of injury or harm.
Accordingly, the Law Division's judgment is affirmed.
NOTES
[1] Although the Rules of Professional Conduct do not deal explicitly with an attorney's duty to disclose a client's or material witness's critical change of testimony, they support such a position.

R.P.C. 3.3 provides that "a lawyer shall not knowingly offer evidence that the lawyer knows to be false," and "[i]f a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." R.P.C. 3.3(a)(4). R.P.C. 3.3(a)(5) deals with an attorney's duty to the tribunal, and requires "disclosure to the tribunal [of] a material fact" which the attorney knows may tend to mislead the tribunal if not disclosed. R.P.C. 3.3(a)(5).
R.P.C. 3.4 states that "[a] lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully ... conceal ... material having potential evidentiary value." R.P.C. 3.4(a). R.P.C. 8.4 deals with an attorney's performance of legal work relative to other parties, and states "[i]t is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice." R.P.C. 8.4(d).
[2] We note, however, that plaintiffs never requested an opportunity to obtain an expert witness based upon De's change of testimony. Even after the trial concluded and plaintiffs moved for a new trial, counsel never sought the opportunity to obtain an expert witness to address De's possible liability based upon her trial testimony.

Moreover, the failure of plaintiffs to obtain an expert opinion indicating that De breached a recognized standard of care applicable to sonogram technicians was noted by the court in granting De's motion for summary judgment. The court observed that plaintiffs' submissions did not support the thesis that De deviated from a recognized standard of care by failing properly to schedule a new sonogram after the first sonogram was taken on August 13, 1990. The court also found nothing in plaintiffs' submissions to indicate that a sonogram technician owes a duty to assure that a physician on duty actually read and interpret a sonogram.
De's change of testimony at trial neither added nor detracted from the court's conclusion.